[No. C061778. Third Dist. Dec. 7, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL RALPH KOVACICH, JR., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V and VI.

## COUNSEL

Riordan & Horgan, Dennis P. Riordan and Donald M. Horgan for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Carlos A. Martinez and Jennevee H. De Guzman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOCH, J.**—In 1982, Janet Kovacich disappeared after telling her husband that she was leaving him and taking their two young children with her. The

husband, defendant Paul Ralph Kovacich, Jr., was controlling and abusive in the marriage; he admitted to cheating on her and was seen in the arms of another woman within two days of her disappearance; he played no active role in searching for her despite the fact that he was a trained dog handler with the Placer County Sheriff's Department; and he told his new girlfriend that his wife "wasn't coming back." In 1995, a portion of Janet's skull was discovered near Rollins Lake, a place defendant had experience patrolling. The skull, which was not determined to be Janet's until 2007, had a hole that was consistent with an entrance wound caused by a gunshot from a large-caliber handgun, similar to the weapon defendant had been issued as a law enforcement officer.

More than 26 years after Janet's disappearance, a jury convicted defendant of first degree murder and found that he personally used a firearm during the commission of the crime. The trial court sentenced defendant to state prison for an indeterminate term of 25 years to life plus a consecutive determinate term of two years for the firearm enhancement.

On appeal, defendant raises several contentions challenging the conviction: (1) the evidence was insufficient to support the conviction; (2) the trial court committed reversible error by admitting out-of-court statements that Janet feared defendant; (3) the trial court committed reversible error by admitting out-of-court statements that defendant kicked the family dog to death; (4) the trial court prejudicially erred by allowing expert testimony on intimate partner abuse and the prosecution engaged in misconduct by eliciting certain responses from the expert that violated an in limine ruling; (5) defendant's trial counsel rendered ineffective assistance by failing to proffer certain evidence purported to undermine the prosecution's case; and (6) the trial court prejudicially erred by excluding evidence that the chief investigator harbored a bias against defendant and by refusing a requested instruction that would have highlighted the defense theory that the murder investigation was not conducted in good faith. We disagree with each contention and affirm the judgment.

## FACTS

The circumstantial nature of the evidence requires that we set forth the facts of this case in unusual detail. We do so in the light most favorable to the verdict, resolving all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1013 [49 Cal.Rptr.3d 765].)

## Background

Defendant and Janet were married in 1973. Janet's parents, Leo and Jean Gregoire, did not approve of Janet's relationship with defendant and did not attend the wedding.[1] The marriage produced two children. Kristi was born in 1975. John was born in 1977. The family moved to Auburn in 1980.

Defendant worked as a sergeant in the Placer County Sheriff's Department. He received a bachelor's degree in police science, completed a master's thesis entitled, "Case Study of the Development of a Police K-9 Unit," and was certified as a dog handler by the Commission on Peace Officers Standards and Training. Janet was primarily responsible for raising the children and was a devoted and loving mother. As Joyce White-Janoski, one of her closest friends, recalled: "She had a very strong bond with [her children]. She was always hugging them. They would be sitting on her lap. She—her children were very important to her. She built her life around her children." Janet's older brother, Gary Gregoire, observed: "She loved her children, and that was very, very, very important to her. You can tell by the photos we just went through, Janet just loved the kids, and they were very—that was the most important thing in her life [was] her two children." Glenda Shields, one of Janet's neighbors, also recalled: "She was very caring, very devoted to her children, spent a lot of time playing with them, interacting with them."

## Marital Relationship

The relationship between defendant and Janet was marred by marital discord, including verbal and physical abuse. Defendant routinely called Janet "stupid shit" and spoke to her in a demeaning tone. He also criticized Janet's physical appearance, particularly the size of her breasts, something she was "very self-conscious about."

At times, defendant's disparaging words turned into physical violence. On several occasions, Janet was observed with bruises on her arms. On one occasion, while White-Janoski was at their house, defendant hit Janet with a large metal utility chain. On another occasion, while boating at Rollins Lake, what began as a water fight ended with a welt on Janet's leg as defendant threw handfuls of mud at her while she begged him to stop. On another boating trip, defendant's close friend, Steven Kassis, cut his foot on some trash Janet had left on the boat; defendant responded by angrily shoving her into the water.

---

[1] For simplicity, members of the Gregoire family will be referred to by their first names or by their relationship to Janet.

Defendant also exercised control over the marriage. According to defendant's own account of the marriage, he "took the role of a parent" with respect to Janet. Janet confirmed that she felt as though defendant "treated her more like his daughter rather than his wife." During the fall of 1979, Janet took a human sexuality course at Sierra College and confided in her instructor that defendant was "very demanding and controlling," but that she was too afraid to leave him at that time because she thought defendant's position in law enforcement would enable him to keep the children. According to Elaine Cunningham, one of Janet's neighbors, Janet was "very nervous all the time," particularly when defendant was on his way home because she "needed to be home when he came home."

In 1980, Janet's brother Gary took some leave time from his service in the Army to visit his parents. During the visit, Gary and Janet went out to lunch together. As they drove to the restaurant, defendant pulled them over in his patrol car. Janet was "very nervous" as defendant approached the car. When Gary asked why he had been pulled over, defendant responded that "he could pull [Gary] over when he wanted to," and that if Gary disagreed, defendant could "find something wrong with the car" and write him a ticket. Gary did not argue with defendant, who walked back to his patrol car and waited for Gary to drive away. Gary and Janet continued to the restaurant, where Janet told her brother that she was "concerned" about her marriage to defendant and felt as though he monitored her movements.

In December 1981, Janet told Gary that "she didn't feel like she loved [defendant] anymore, that the relationship was not what she wanted in her life." She also said that she planned to leave defendant and was embarrassed by the fact that her family had warned her not to marry him. At the beginning of 1982, she told Gary that "she wished that she would have gone to school and gotten her degree and did things like that." Around this time period, she also told one of her friends, Christine Milam, that she was "miserable" in her marriage, "afraid" of defendant, and that she "wanted to leave [him]." Milam witnessed firsthand defendant's controlling and abusive behavior during a trip to the movie theater with Janet, Milam's son, and Janet's children. As Milam described: "[Defendant] followed [them] all the way to the movies, and he came barreling up in his truck behind [them]. He jumped out of the truck, grabbed ahold of [Janet], was screaming profanities at her." Milam held her son and Janet's children away from the confrontation while defendant dragged Janet a short distance. Janet was "[c]rying, upset, scared to death."

### Death of the Family Dog

Defendant's abusive behavior extended to the family dog. He and Janet owned two German shepherds, Adolph and Fuzz. Adolph was defendant's

police dog and Fuzz was the family dog. In August 1982, about a month before Janet disappeared, Fuzz was taken to the veterinary clinic in critical condition. The dog died on the examination table, "reflexively gasping [for air] because its brain [was] deprived of oxygen and blood." As defendant explained the events leading up to Fuzz's death, the dog got into some garbage and defendant kicked the dog several times in order to discipline the animal. He admitted that he "went overboard," but denied causing the dog's death. He also admitted that Janet and the children witnessed the assault, as they had on numerous prior occasions.

Janet believed that Fuzz's death was caused by the kicking. In tears, she told her brother Gary about the dog's death and explained that "she was starting to feel threatened at home, and she was worried for her safety, and she was worried for Kristi and John." At a Placer County Deputy Sheriffs' Association barbeque, Janet cried as she told Gail Easter, the wife of another Placer County Sheriff's Department sergeant, that defendant had kicked the dog to death and that she was "very frightened" of defendant. She also told Frances Myres and Glenda Shields, two of her neighbors, that defendant had kicked the dog to death. Myres described her demeanor as "very sad and very upset." Shields described it as "hysterical, crying, extremely distraught."

### Janet's Decision to Leave Defendant

Janet decided to leave defendant shortly after Fuzz's death. While she had left defendant twice before, this time her resolve appeared to be stronger. She enrolled in prenursing courses at Sierra College two days after the dog died. Janet also called a close friend, Kim Johnson, discussed her marital problems, asked how Johnson had ended her marriage, and asked for the name of Johnson's divorce attorney. She then asked whether she could stay with Johnson, which left Johnson with the impression that she was "setting up a network of places she could go if she left [defendant]."

Janet also told her friend White-Janoski: "I'm finally going to leave [defendant]. I am really going to do it this time." She explained that she wanted to leave because defendant was demeaning and abusive towards her, and that she also planned to take the children when she left. Janet talked about going back to school and sounded "more confident" and "more like her old self." About the same time, Janet began researching the prospect of removing Kristi and John from their current school, St. Joseph's Catholic School, and placing them in a different private school, Forest Lake Christian School.

About a week later, Janet called her brother Gary and informed him that she planned to leave defendant, go back to school, and move herself and the

children out of the house they shared with defendant. She also told Gary that she planned to change the children's school. According to Gary, his sister sounded "more sure of herself" during this conversation.

### The Days Leading up to Janet's Disappearance

In September 1982, six days before she disappeared, Janet had breast augmentation surgery. Janet was "bright and cheerful" and told the surgeon that she would be enrolling her children in a new school the following week, and would be going "back to college herself." Following the procedure, she was informed that recovery would take at least six weeks, and that she should restrict the movement of her arms and refrain from driving. The next day, Janet returned to the surgeon for a followup appointment and seemed "pleased with the results." Two days before she disappeared, Janet told a friend, Jeannette Baldwin, that she was "excited about going back to school" and also mentioned that she was transferring her children from St. Joseph's to Forest Lake, but "was anticipating a conflict" with defendant.

The day before Janet disappeared, which was the day after Labor Day and the first day of school at St. Joseph's, Janet spoke to Janice Reynolds-Gage, another parent at the school who had left an abusive relationship of her own. Janet shared that "she felt emotionally and mentally abused, that there was taunting going on in her relationship about her appearance," that she "had some plastic surgery done and was going to have further plastic surgery done" because "she was feeling fairly low in self-esteem," and that she was "frightened" of defendant and "considered filing a restraining order against [him]." That night, Janet spoke to her neighbor Myres on the phone and told her that she was "excited about going [to school], anxious to get going on it, and looking forward to a new phase in her life, a career, and the fun of going back to school and a career and making something important of herself."

Meanwhile, during the early morning hours the day before Janet disappeared, defendant had finished his Labor Day shift patrolling the California State Fair and was attending a law enforcement party in celebration of "getting through the fair." At the party, defendant was seen "embracing and kissing" another woman. This was not the first time defendant had ventured outside the marriage. Defendant himself admitted to having sexual encounters of the "one night stand" variety with other women.

### Janet's Disappearance

On September 8, 1982, the morning Janet disappeared, her children were picked up for school around 8:00 a.m. by Brenda Krch, one of Janet's neighbors and a participant in a multifamily carpool arrangement. Around

9:00 a.m., Janet called Forest Lake Christian School and told Marion Entz, the registrar, that she wanted to enroll her children in the school, but because of her recent surgery, she could not drive herself and would need to call back to schedule an appointment when she had secured a ride. About an hour later, Janet called back, told Entz that she had found a ride to the school, and scheduled an appointment for 11:10 a.m. Janet neither showed up for the appointment nor cancelled it. She was never seen again.

According to defendant's version of the morning's events, told to homicide detectives a week later, after the children were picked up for school, Janet went upstairs to their master bedroom, where defendant was still in bed, and began to do her hair and makeup in the master bathroom. She then started yelling about her father "going out on [her] mother" and "drinking again." Defendant told her to "give the guy a break," and said, "he's got cancer. . . . I'm sure he doesn't have all that much longer to live." He then got up and began to get ready for the day.

According to defendant, a short time later, Janet told defendant that she was "unhappy" with their marriage, but offered no specific grievances. Defendant, feeling "a little cocky" because "a couple girls looked at [him]" while he was at the state fair, suggested that they get a divorce. As defendant explained, he wanted to "beat her to the punch and . . . mentally push her in a corner to see how serious" she was about leaving. After some "vague back and forth," Janet agreed to a divorce and they calmly discussed property division, custody of the children, and visitation rights. After a pause in the discussion, Janet brought up changing the children's school from St. Joseph's to Forest Lake. Defendant nonchalantly agreed, "again pushing her in a corner." Janet then made two phone calls to Forest Lake. After the first phone call, defendant offered to drive Janet to the school, but she refused, explaining that she would get her own ride. She then called the school again and scheduled an appointment for 11:15 a.m. Defendant assumed that Janet's mother would be taking her to the appointment and left to run some errands.

The next time defendant's location was confirmed by a witness was after 11:30 a.m. at his gym. This was according to an aerobics instructor who testified that she saw him at the gym either before or after her two aerobics classes, which ran from 9:00 to 11:30 a.m.[2] Defendant was then seen between 12:00 p.m. and 12:30 p.m., when he stopped by the jail to check his mailbox.

Around 3:00 p.m., Krch drove the children home from school and saw defendant outside washing his truck. Defendant asked: "Is Janet with you?"

---

[2] Because defendant's own timeline of events places him at home prior to and during Janet's two phone calls to Forest Lake, this would preclude him from being at the gym before 9:00 a.m.

Then he said: "Oh, no. She wouldn't be. That's right. She's with her mother." Around 4:00 p.m., defendant called Forest Lake and angrily demanded: "Where's my wife?" Entz explained that Janet never made it to the appointment. About the same time, defendant called their neighbor Myres and asked whether "she had seen Janet or seen anything like cars leaving the house." Myres responded in the negative. Around 7:00 p.m., Entz called defendant to check on Janet. Defendant said: "I think she might be at her mother's. She often goes there." Around 8:00 p.m., defendant called Janet's parents' house, and spoke to Janet's father. Janet was not there.

Janet's mother worked as the vice-principal at San Juan High School in Citrus Heights. The school's principal testified that she was present at the school on September 8, 1982. He also explained that the first few weeks of school were a "very busy time" for administrators, requiring them to work "10, 11 hours each day trying to get the kids in classes, get them registered, get schedules out, talking to parents, just making all the adjustments in the schedule that have to occur." That night, Janet's mother also had a meeting with parents regarding the school's new attendance policy.

### The Days Following Janet's Disappearance

On September 9, 1982, defendant went to work at the jail and calmly informed Sergeant Stephen Butts that his wife was missing. He stated that there was a "minor altercation" over changing the children's school, that Janet "advised him that she was upset with her role in life," and that "she wanted to separate." In front of Butts, defendant called Janet's mother on the phone, asked if she knew where Janet was, and told Butts that she was not with her mother. Defendant then told Butts that Janet was "depressed over her plastic surgery" and that "she may have committed suicide." Despite this dire suggestion, defendant told Butts to "hold off on filing a report to see if he could locate her."

If defendant was attempting to locate his wife, he kept it a secret from friends and neighbors. Aside from the handful of inquiries recounted above, defendant neither asked whether anyone had seen Janet nor asked for help finding her. When Reynolds-Gage found out that Janet was missing, she called defendant to see if there was anything she could do to help. He responded: "I don't need anything. We've got it covered." However, despite being a trained dog handler, he never participated in the search that was conducted in the days following his wife's disappearance.

Nor did defendant show concern for his wife during this time period. He missed no days of work following Janet's disappearance and the children missed no days of school. The aerobics instructor who provided defendant

with a partial alibi for the morning Janet disappeared spoke to him after learning of her disappearance and expressed her concern. Defendant responded: "Remember, I was here that day." His demeanor was "cold" and "aloof," showing "no apparent concern for his wife." Defendant's friend Kassis also described his demeanor as "nonemotional" when talking about his wife. Defendant told Kassis that Janet "just left" and mentioned that he believed her parents had something to do with her disappearance. He also said that "he would make sure [her parents] never had access to their grandkids." And six days after Janet disappeared, defendant had a document notarized that transferred custody of the children to defendant's parents in the event that an accident or injury rendered him unable to properly care for them.

### Initial Investigation

On September 11, 1982, three days after Janet disappeared, defendant called Sergeant Butts and calmly stated that he wanted to file a missing persons report because Janet "still hadn't returned home" and defendant "believed that she had met with an accident due to her absence." Butts called Janet's mother, who was "upset" because her daughter was missing and she believed defendant "had done something to her." Butts then contacted Chief Nicholas Willick and Detective Danny Boon with the Auburn Police Department and relayed the information to them.

The next day, Detective Boon interviewed Janet's mother. As Boon described her demeanor: "Emotionally, she was very distraught, very—by the time the interview was over, I was nearly in tears myself. She was crying off and on. There were times when she was angry. It was a very, very—it was a very hard interview for her." Janet's father was also present for the interview. He was "somewhat quiet" but was also "nearly in tears at times."

Later in the evening, Detective Boon spoke to defendant at the jail. In contrast to the demeanor of Janet's parents, defendant was "very calm" and "very placid." Defendant told Boon that he believed Janet's mother might have hidden her from him. He also told Boon that the morning Janet disappeared, they had a "discussion about their marriage" and "some of the things they discussed were divorce, property settlement, kids, and moving the kids from St. Joseph's to Forest Lake." Defendant explained that he agreed with everything Janet brought up because "he was playing head games with her." He also told Boon that Janet had made two phone calls to Forest Lake that morning, one at 9:00 a.m. and another at 10:00 a.m., and that he left the house to run errands after she refused his offer to drive her to Forest Lake. Defendant further told Boon that he assumed Janet was with her mother because when he called their house the night of her disappearance, Janet's mother was not home either.

When Detective Boon asked whether defendant had noticed "anything unusual" about the condition of the house when he returned home, defendant responded that "he hadn't looked that good" and offered Boon the keys to the house to conduct a search. Boon then performed a cursory search of defendant's house to determine whether there were any signs of a struggle and found nothing out of the ordinary. He did find a woman's watch and a two-ring wedding set next to the sink in the master bathroom. When he returned defendant's keys and told him about the watch and wedding set, defendant seemed surprised and said he had not seen them.

The investigation continued September 13, 1982. Phone calls were made. The neighborhood was canvassed. Potential witnesses were interviewed. Detectives determined that there was no recent bank account activity and that Janet did not show up for her college classes. Local hotels and various modes of transportation were investigated, including rental car companies, the local taxi service, the bus depot, a private air service operating out of Auburn, and the Sacramento International Airport. No leads were uncovered. The media was also informed of Janet's disappearance. The next day, detectives conducted forensic searches of defendant's house, his cabin in Cisco Grove, and his parents' property in Lake of the Pines. His vehicles were also searched. Nothing useful was uncovered in these searches.

On September 15, 1982, defendant was formally interviewed by Detective Boon and Inspector Johnnie Smith from the Placer County Sheriff's Department. Defendant provided the version of events recounted above, essentially that the morning Janet disappeared they calmly discussed divorce, property division, child custody, and transferring the children to Forest Lake, that defendant agreed with everything Janet said as a psychological game, and that he left the house to run errands after she made two phone calls to Forest Lake and refused his offer to drive her to the school. He also provided his version of the dog-kicking incident and admitted to cheating on Janet.

Defendant further explained that the first two days Janet was missing, he believed she was with her mother. After that, he began to suspect suicide and was "really down." But then, he "picked up a little bit" in the hope that she "just called a friend that [he was] not aware of, ah, and ah, ah, this might be a male, and just took off." While defendant said that he did not suspect Janet of cheating on him, he then mentioned that "she goes out shopping a lot" and stated: "If she wanted to cheat on me, she could probably do it too and be so discreet about it, that I wouldn't know about it." Later in the interview, defendant stated that he believed Janet had previously tried to kill herself. He also said that he "wouldn't put it past" Janet's mother to hide her from him and their children regardless of the psychological trauma that would cause the children.

Despite the fact the interview was conducted on Janet's birthday, defendant never mentioned this to Detective Boon or Inspector Smith. Defendant was calm through most of the interview, raising his voice towards the end when he said to Smith: "I don't want to play careers or education against education, but I bet I have more background and more, more—other ideas on, on law enforcement than you will ever have." And at the close of the interview, defendant said to Smith: "I've heard a lot about you. This is going to be an interesting challenge." At no point during the interview did defendant become "teary eyed or choked up or show any sign of emotion."

Later in the day, Inspector Smith interviewed Janet's parents. In contrast to defendant's demeanor, they were "very emotional and upset over the disappearance of their daughter."

The investigation continued in the following days and weeks. Extensive coordinated aerial and grid searches were conducted. As already mentioned, defendant was never seen searching for his wife. Throughout the investigation, Janet's mother remained in communication with Chief Willick and Detective Boon, repeatedly checking on the status of the investigation. Defendant may have called once. Janet's mother also expressed concern about the objectivity of the investigation because defendant was a law enforcement officer, prompting Boon to contact several other law enforcement agencies to review the case, including the Sacramento Police and Sheriff's Departments and the California Department of Justice.

Chief Willick also contacted Detective Michael Davinroy from the Fullerton Police Department to assist in the investigation. Davinroy interviewed defendant on November 23, 1982. This interview became heated. Defendant stated that he felt "cheated" that the detectives did not talk to the aerobics instructor at the gym about his alibi until he "started bitching" about it to Inspector Smith several days after Janet disappeared. He also said that he believed Janet's mother paid her to disappear and further stated: "I think she's out there, and I think she's having a hell of a time."

In February 1983, defendant began a serious relationship with C.K. Martin, who also worked at the Placer County Jail. The relationship lasted about five months and included Martin moving into defendant's house. When they first started dating, defendant told Martin that he did not know what happened to Janet. Later in the relationship, he said that she "left with someone else." At some point, Martin told defendant that she was not comfortable sleeping on the same mattress that he slept on with Janet for so many years and suggested that he get a new mattress. Defendant responded that "he didn't need to get a new mattress; that she wouldn't be sleeping on it anymore. She wasn't coming back." During the time Martin lived at the house, defendant discouraged the children from talking about their mother in front of her. And on one

occasion, when John cried about his mother's absence, defendant told him that "big boys don't cry." Martin never saw defendant show sadness over his wife's absence. Nor did she see him attempt to locate her. Defendant also prevented Janet's parents from seeing their grandchildren.

Around this time period, the Department of Justice assigned an agent, Kenneth O'Farrell, to assist in the investigation. O'Farrell conducted followup interviews with a number of individuals, including defendant. Defendant again claimed that Janet's mother was responsible for her disappearance, this time adding that her mother was also missing for the first two days. However, as already mentioned, the morning after Janet disappeared, defendant called Janet's mother on the phone in front of Sergeant Butts, who testified that defendant asked if she knew where Janet was, and then said that Janet was not with her. When defendant remembered this during the interview, he revised his claim that Janet's mother was missing for two days, but maintained that she was not home when he called their house the night of Janet's disappearance. Defendant also repeated his claim that Janet's mother had offered to pay her to leave him.

By the middle of 1983, the investigation was still ongoing, but was no longer investigated on a day-to-day basis. Janet's mother continued to call seeking information on the case. Eventually, all of the leads dried up, and the investigation was terminated. When Agent O'Farrell informed Janet's mother that they were ending the investigation, she "started sobbing uncontrollably" and "begged [him] not to shut the investigation down."

### Discovery of the Skull at Rollins Lake

In 1995, the cranial portion of Janet's skull was found near Rollins Lake, about 18 miles north of Auburn, protruding from the mud at the bottom of a recently drained pond. The cranium, which was not determined to be Janet's until 2007, had an unnatural hole measuring 0.65 of an inch in diameter. According to the testimony of two forensic anthropologists, the hole in Janet's skull was inflicted at or about the time of death and was consistent with a gunshot wound from a large-caliber handgun.

Defendant's field training with the sheriff's department made him familiar with the roads and area surrounding Rollins Lake. He was issued a Smith & Wesson .357 Magnum revolver as part of his service equipment.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant contends that we must reverse the firearm enhancement because the evidence was insufficient to establish beyond a reasonable doubt that Janet's death was caused by a firearm. He further asserts that, because of this, the evidence was also insufficient to support his murder conviction. We disagree.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077 [81 Cal.Rptr.3d 651, 189 P.3d 911]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320 [61 L.Ed.2d 560, 572–574, 99 S.Ct. 2781].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66 [132 Cal.Rptr.2d 271, 65 P.3d 749].) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Accordingly, we must affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

Because defendant's attack on the sufficiency of the evidence is focused on the forensic evidence, we begin by discussing that evidence.

Dr. Steven Symes, professor of forensic anthropology at Mercyhurst College in Erie, Pennsylvania, testified that the hole in the cranium recovered from Rollins Lake was consistent with a gunshot wound from a large-caliber handgun. He explained that there is a difference between ballistic (high-velocity) and blunt force (low-velocity) trauma, and that bone responds differently to the two forms of impact. With a blunt force impact, the bone will bend and fail in plastic deformation, essentially caving in. With a

ballistic impact, the higher velocity causes the bone to act more like glass, creating a "plug and spall"; the outside of the bone will have a fairly uniform hole where the bone is punched through, causing a shock wave that creates a cone-shaped bevel on the inside of the bone.

Dr. Symes explained that the hole in Janet's cranium exhibited the characteristics of a ballistic impact, particularly the beveling of the bone, a radiating fracture extending from the hole to a natural cranial suture, and the separation of the suture as the energy from the impact traveled along the fracture line and through the suture. The presence of a radiopaque particle embedded in the petrous portion of the temporal bone also contributed to Dr. Symes's conclusion that the hole was caused by a ballistic impact. The size of the hole, coupled with the fact that the radiating fracture followed some of the middle meningeal arteries that extend along the inside of the skull, but then turned away from these arteries, indicated to Dr. Symes that the hole was likely caused by a large-caliber, lower velocity handgun as opposed to a higher velocity weapon.

Dr. Patrick Willey, professor of forensic anthropology at Chico State University, also testified that the hole in the Rollins Lake cranium was consistent with a gunshot wound. This conclusion was also based on the beveling of the bone, the radiating fracture, and the radiopaque particle embedded in the bone.

Defendant argues that we must reverse the firearm enhancement because this forensic evidence "clearly was consistent with two reasonable conclusions: that the defect was attributable to a gunshot and that it was due to an agency other than a firearm." He posits that since the cranium had been in the mud near Rollins Lake for many years, and since Rollins Lake is a well-frequented camping ground, "it certainly was very possible that Janet's skull, which indisputably had been broken in pieces by taphonomic forces, had been struck by some sharp digging instrument during that time." We are not persuaded.

While, as defendant points out, Dr. Willey admitted to having never seen a pickax injury, he also explained that "if it were a pickax, it's going to have some of the properties of blunt force, so instead of that beveling and radiating fractures, I think it's going to be a penetrating wound . . . . [¶] And my bet would be that it's going to show some of the properties we typically associate with blunt force, kind of the caving in of the wound, and we don't get that with the Rollins Lake [cranium]." Dr. Symes, who had seen pickax injuries in his career, confirmed that a pickax causes blunt force trauma: "It may have a sharp end on it. It could be sharp, but it turns into blunt trauma and is a penetrating wound. It could be [the] size of a bullet hole, but we know it is

[moving more slowly], so you're going to see reduced energy." While a pickax could create a round hole and radiating fracture, because the tool expands, it typically creates "microfractures around the entrance where it is crushing more." And because of the reduced energy, a pickax injury would not create pressure in the skull, and therefore would not create beveling on the inside of the bone and separation of the natural sutures.

Drs. Willey and Symes also testified that the hole in Janet's cranium was sustained at or about the time of death, and was inconsistent with an injury occurring long after death, because the beveling and radiating fracture would have required the bone to possess a certain amount of elasticity. Thus, defendant's theory that Janet's cranium could have been struck by a camper's pickax following her death would require that camper to have struck the cranium with the sharp point of the pickax with enough velocity to cause ballistic trauma, while pulling the instrument back before the expanded portion of the pickax could crush the edges of the hole. Because this injury was inflicted close to the time of death, this camper either did not notice striking a decomposing corpse with his pickax or chose not to call the police to report that he had found and accidentally mutilated a dead body. While Dr. Willey acknowledged that "almost anything is possible," the jury was more than justified in concluding that this possibility was not reasonable.

Nor are we persuaded by defendant's reliance on *People v. Allen* (1985) 165 Cal.App.3d 616 [211 Cal.Rptr. 837] (*Allen*). There, two defendants, Allen and Brewer, entered Ainsworth's house for the purpose of executing him and eliminating any witnesses to that execution. Two such witnesses, Ainsworth's wife and cousin, survived the encounter. According to their testimony, Allen and Brewer entered the kitchen with Ainsworth. Two shots were fired. Allen then entered the bedroom and shot the wife once. Brewer shot her several more times after she crawled into the closet to hide. Allen fired a final shot at the cousin, who was hiding behind the couch; this shot missed, and both defendants left the house. Ainsworth died of two gunshot wounds to the head and chest. (*Id.* at pp. 621–622.) Allen and Brewer were convicted of the first degree murder of Ainsworth and the attempted murders of the wife and cousin; each was found to have personally used a firearm during the commission of the crimes. (*Id.* at pp. 620–621.)

The Court of Appeal reversed the personal-use firearm enhancement with respect to the murder count: "Since two .32 caliber cartridges were found on the kitchen floor, the evidence suggested that both of [Ainsworth's] wounds were inflicted by the same gun. Whether that gun was used by Allen, as opposed to Brewer, is purely a matter of conjecture. The state had the burden of establishing Allen's *personal* use beyond a reasonable doubt. [Citation.] Since the evidence of what happened in the kitchen proved at most a 50

percent probability that he was the user, the state's burden was not met: 'We . . . have a case belonging to that class of cases where proven facts give[] equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other. . . .' [Citation.]" (*Allen, supra*, 165 Cal.App.3d at p. 626, quoting *Penna. R. Co. v. Chamberlain* (1933) 288 U.S. 333, 339 [77 L.Ed. 819, 823, 53 S.Ct. 391].)

■ Defendant misconstrues *Allen, supra*, 165 Cal.App.3d 616, to hold that the People must eliminate the "possibility" that someone other than defendant is the shooter in order for a personal-use firearm enhancement to stand. He then argues that because the forensic anthropologists in this case could not "absolutely eliminate" every other potential cause of the hole in Janet's cranium, the People did not eliminate the possibility that she died from something other than a firearm. Because of this, argues defendant, we must reverse. This argument fails for two reasons. First, *Allen* does not require the People to eliminate the possibility that someone other than defendant was the shooter or that the deceased's death was caused by something other than a firearm. The case merely holds that where the facts supporting two inconsistent inferences stand in equipoise, judgment must go against the party with whom the burden of sustaining one of the inferences resides.

Second, what an anthropologist can conclude from a forensic examination of bone is more limited than what a reasonable jury may find beyond a reasonable doubt after considering the evidence as a whole. (See *People v. Thomas, supra*, 2 Cal.4th at p. 515.) The fact that Janet vanished about an hour before she was scheduled to appear at Forest Lake, left behind her children and personal belongings, never contacted her friends and family, never withdrew any money from her bank account, and failed to show up for her college courses, all create a reasonable inference that she was killed the morning she disappeared. (See *People v. Ruiz* (1988) 44 Cal.3d 589, 610–611 [244 Cal.Rptr. 200, 749 P.2d 854]; *People v. Johnson* (1991) 233 Cal.App.3d 425, 442 [284 Cal.Rptr. 579].) The prosecution also provided the jury with substantial evidence indicating that Janet was not suicidal and would not have abandoned her children. Instead, she was looking forward to getting herself and her children away from defendant, going back to school, and "making something important of herself."

Defendant's relationship with Janet was filled with antagonism and enmity, including verbal and physical abuse and two prior separations. He was alone with her the morning she disappeared, and by his own admission, they had a "minor altercation" after Janet told him she was leaving. This was highly

probative of defendant's motive to kill her, and thus his identity as the killer. (See *People v. Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53]; *People v. De Moss* (1935) 4 Cal.2d 469, 473 [50 P.2d 1031].) Defendant also admitted to cheating on Janet before her disappearance, which was also probative of motive to kill. (See *People v. Gosden* (1936) 6 Cal.2d 14, 25 [56 P.2d 211]; *People v. Houston* (2005) 130 Cal.App.4th 279, 307 [29 Cal.Rptr.3d 818].)

From the testimony of Drs. Symes and Willey, the jury could reasonably have concluded that Janet died from a gunshot wound to the head from a large-caliber handgun. Defendant happened to possess such a handgun. He also admitted to offering to give Janet a ride to Forest Lake the morning she disappeared, stating that he nonchalantly agreed with everything she said in order to play "head games" with her. Based on these statements, and the history of abuse in the marriage, the jury was justified in concluding that defendant's mild reaction to the news of her imminent departure was not genuine. And based on Janet's second phone call to Forest Lake, in which she confirmed that she had secured a ride and scheduled an appointment for 11:10 a.m., the jury could reasonably have concluded that she accepted defendant's offer to drive her to the school. Indeed, Janet's surgery precluded her from driving herself, her mother was at San Juan High School all day, and she asked no one else for a ride.

Defendant's location was not confirmed by a witness until after 11:30 a.m., which gave him plenty of time to drive Janet to Rollins Lake, an area he was familiar with, shoot her in the head with a large-caliber handgun, which he had access to, and return to Auburn to make an appearance at the gym. Thus, defendant not only had a strong motive to kill Janet, but also had the opportunity to have done so. Defendant's demeanor and actions following Janet's disappearance also were consistent with the jury's conclusion that he killed her. He was "cold" and "aloof." He did not bother to look for her despite his training as a dog handler. He began a serious relationship within months of her disappearance and told his new girlfriend that Janet "wasn't coming back."

Based on all of the circumstantial evidence in this case, the jury could have concluded beyond a reasonable doubt that defendant murdered his wife, and that he did so by use of a firearm.

## II

### State of Mind Evidence

Defendant also claims the trial court committed reversible error by admitting certain out-of-court statements made by Janet in which she expressed her fear of defendant. He is mistaken.

"The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence. [Citation.] This standard is particularly appropriate when, as here, the trial court's determination of admissibility involved questions of relevance, the state-of-mind exception to the hearsay rule, and undue prejudice. [Citation.] Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321] (*Guerra*); see *People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

■ "Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)[3] Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) Under the hearsay rule, subject to several exceptions, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" is generally inadmissible. (§ 1200, subd. (a).)

■ Section 1250 provides an exception for "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health)." In order for this exception to apply, the statement must not have been made under circumstances indicating a "lack of trustworthiness" (§ 1252), and must be offered either "to prove the declarant's state of mind, emotion, or physical sensation," or "to prove or explain acts or conduct of the declarant." (§ 1250, subd. (a).) A prerequisite to this exception is that the declarant's mental state or conduct be placed in issue. (*People v. Noguera* (1992) 4 Cal.4th 599, 621 [15 Cal.Rptr.2d 400, 842 P.2d 1160] (*Noguera*).) "Evidence of the murder victim's fear of the defendant is admissible when the victim's state of mind is relevant to an element of the offense." (*Guerra, supra*, 37 Cal.4th at p. 1114.) Such evidence is also admissible when the

---

[3] Undesignated statutory references are to the Evidence Code.

defendant claims that the victim has behaved in a manner inconsistent with that fear. (*People v. Lew* (1968) 68 Cal.2d 774, 778–780 [69 Cal.Rptr. 102, 441 P.2d 942]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103 [98 Cal.Rptr.2d 696] (*Escobar*).)

■ "In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. [Citation.] Again, such evidence must be relevant to be admissible—the declarant's state of mind must be in issue. [Citation.] A limiting instruction is required with declarations used as circumstantial evidence of the declarant's mental state; that is, the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered. [Citation.]" (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [44 Cal.Rptr.2d 914] (*Ortiz*).)

Defendant acknowledges that Janet's state of mind the morning she disappeared was in issue. He also acknowledges that her general statements of fear were relevant to determining whether she informed him of her plans to leave and take the children with her, providing defendant with a motive to kill her, or whether she instead committed suicide or abandoned him and the children, as he suggested to detectives. Nevertheless, defendant argues the inadmissibility of five particular out-of-court statements in which Janet stated that she feared what defendant would do if she left him or otherwise acted against his wishes.

These are the five challenged statements: (1) After Janet told her brother Gary about the fear she felt for her safety and that of her children stemming from the dog-kicking incident, she further stated that defendant had previously told her that "it would not go well for her" if she left him because he was in the police force, knew the system, and knew the attorneys and judges. (2) Janet told her friend Baldwin that "she was afraid of what might happen if she tried to do something that wasn't within the bounds of what [defendant] wanted." (3) Janet also told Baldwin two nights before she disappeared that defendant supported neither her breast augmentation surgery nor her plan to go back to school, and that she was "afraid at that point of [doing] something that he wouldn't want." (4) Janet told another friend, Diane Ambrose, that defendant employed too much discipline in the house, that "it was either [defendant's] way or the highway," and that there would be "hell to pay" if she did not do things the way defendant wanted them done. (5) Janet also told Carolyne Young, another parent at St. Joseph's, that she was "not happy with her marriage" and that "she was afraid of what [defendant] would do if she tried to leave."

Defendant moved in limine to exclude Janet's out-of-court statements describing her fear of defendant. This motion was denied. The jury was properly admonished that all such statements were offered for the limited purpose of proving Janet's state of mind. This admonition was repeated several times and provided to the jury in writing.

According to defendant: "Statements of fear that defendant would retaliate if Janet tried to leave effectively constitute evidence of threats, i.e., that defendant intended to harm Janet if she tried to leave, and that, in fact he had done so. Admission of the statements for that purpose, however, is categorically prohibited under [*People v. Hernandez* (2003) 30 Cal.4th 835 [134 Cal.Rptr.2d 602, 69 P.3d 446]], and related precedent inasmuch as they are aimed at directly identifying defendant as causing Janet's death." We disagree.

In *People v. Hernandez, supra,* 30 Cal.4th 835, during the penalty phase of a capital murder trial, the People introduced evidence that the defendant had committed an uncharged murder. This evidence came in the form of out-of-court statements from the victim in which he expressed his fear that the defendant and two other men were going to kill him. Our Supreme Court held these statements to be inadmissible hearsay, explaining that a murder victim's expressed fear of the person charged with the murder is inadmissible when the purpose is to prove the killer's identity. (*Id.* at p. 872.) While the People argued that the statements were admissible to prove the victim's state of mind, the court explained that neither his mental state nor his conduct was an issue in the case. (*Id.* at pp. 872–873, citing *Noguera, supra,* 4 Cal.4th at p. 622 [victim's state of mind and conduct not in issue when the only disputed issue was the identity of the killer].)

Similarly, in *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*), the People introduced evidence that the victim told a friend the day of her murder that the defendant, her husband, was going to kill her and would never let her leave. Our Supreme Court held this statement to be inadmissible hearsay, explaining that the victim's state of mind on the day of her death was not an issue in the case. (*Id.* at p. 529.) Nor was the statement admissible to prove or explain her conduct because "the defense *did not raise any issue of fact* with respect to [the victim's] conduct immediately preceding her death. The undisputed prosecution evidence . . . established that [the victim] was reclining on a couch when she was shot by defendant. The defense did not dispute this fact but rather rested its entire case upon a contention that defendant's mental state at the time of his act . . . was not that required for murder." (*Id.* at pp. 530–531; see also *People v. Arcega* (1982) 32 Cal.3d 504, 526–528 [186 Cal.Rptr. 94, 651 P.2d 338]

[victim's statement that she was afraid defendant would " 'beat her up' " held to be inadmissible hearsay because her mental state and conduct were not in issue].)

However, in *Escobar, supra*, 82 Cal.App.4th 1085, the Court of Appeal held a similar out-of-court statement from a murdered wife to be admissible. The wife told a friend: " 'I want to get a divorce. I don't want to live with him any longer. But at the [same] time, I'm afraid of him because he already told me that if I leave him he is going to kill me.' " (*Id.* at p. 1092.) The court held the statement to be admissible because the defendant placed his wife's mental state and conduct immediately preceding her death in issue by testifying that she "fearlessly challenged him in the garage, kicked him in the testicles, and insulted him in a very provocative way." (*Id.* at p. 1103.) He claimed this to be sufficient provocation to reduce the killing from murder to voluntary manslaughter. (*Ibid.*) The wife's statement of fear tended to refute the defendant's claim that she provoked him in such a manner, and was therefore admissible under section 1250. (82 Cal.App.4th at p. 1103.)

Thus, contrary to defendant's position, an out-of-court statement describing the declarant's fear is not inadmissible simply because it also contains the reason for that fear, i.e., that the defendant had threatened the declarant. Instead, admissibility turns on whether the declarant's mental state has been placed in issue in the case. Indeed, the statement at issue in *Escobar* can be broken into two parts: "I'm afraid of him," and "he already told me that if I leave him he is going to kill me." The first part is admissible under section 1250 because it is a statement of the declarant's then existing state of mind offered to refute the defendant's claim that she acted in a manner inconsistent with her stated fear. The second part is not hearsay because it is not offered for the truth of the matter asserted, i.e., that the defendant actually threatened to kill her, but rather as circumstantial evidence that she feared the defendant. Both parts of the statement are admissible as long as the declarant's state of mind is at issue in the case, provided the trial court also concludes that the jury will be able to use the evidence solely as evidence of the declarant's state of mind. (See *Ortiz, supra*, 38 Cal.App.4th at pp. 389–392.)

*Rufo v. Simpson* (2001) 86 Cal.App.4th 573 [103 Cal.Rptr.2d 492] (*Simpson*) clarifies this point in the context of facts similar to those in our case. During a wrongful death action arising from the murder of Simpson's ex-wife Nicole and her friend Ronald, the trial court admitted certain statements Nicole made in a phone call to a battered women's shelter in which she expressed fear of Simpson and also stated several reasons for that fear. The Court of Appeal held that Nicole's statements that she was "unnerved and frightened" were admissible under section 1250 and the stated reasons were admissible as circumstantial evidence of her state of mind. (86 Cal.App.4th at pp. 591–592.)

The court explained: "[T]he statements made in the telephone call to the battered women's shelter were *not* admitted *to prove*: (a) that her ex-husband had been calling her, begging her to come back to him; (b) that he was stalking her; (c) that she found him staring at her in a restaurant and a market and following her vehicle; (d) that he had beaten her throughout the marriage; and (e) that he had told her [at] different times that if he ever caught her with another man he would kill her. . . . [¶] Rather, these statements were offered or admitted only as circumstantial evidence from which inferences could be drawn concerning how Nicole felt about the nature of the relationship between her and Simpson. They were offered to explain her conduct in finally terminating the relationship, which in turn was alleged to have provoked Simpson to murder. As such, they were not hearsay." (*Simpson, supra*, 86 Cal.App.4th at p. 591, citing *Ortiz, supra*, 38 Cal.App.4th at pp. 389–390.)

The court also rejected Simpson's argument that Nicole's mental state was not in issue: "Based on the particular circumstances and plaintiffs' theory of the case, the trial court reasonably concluded that Nicole's state of mind was in issue, and that evidence offered for the limited purpose of showing her state of mind was relevant and admissible. According to plaintiffs' theory of the case, Nicole, after a long, stormy, sometimes violent relationship with Simpson and efforts to reconcile, decided in May of 1994 finally to end the relationship; the final few weeks were tense; Simpson reacted negatively; finally, on the night of the killings, when Simpson was excluded from the family gathering he flew into a rage and killed Nicole, along with Ronald, an unanticipated bystander. The proffered evidence explained how she was feeling about Simpson, tended to explain her conduct in rebuffing Simpson, and this in turn logically tended to show Simpson's motive to murder her." (*Simpson, supra*, 86 Cal.App.4th at p. 594.)

In this case, like *Simpson, supra*, 86 Cal.App.4th 573 and *Escobar, supra*, 82 Cal.App.4th 1085 and unlike *Hernandez, supra*, 30 Cal.4th 835 and *Ireland, supra*, 70 Cal.2d 522, Janet's mental state was placed in issue. This is so for two reasons. First, the People's theory of the case was that Janet's overall unhappiness in the marriage and fear of defendant, both for herself and for her children, caused her to finally decide to leave him and take the children with her. While she had left defendant before, this time her resolve appeared to be stronger. She enrolled in college courses. She had surgery designed to improve her self-esteem. She made plans to enroll the children in a different school. She then confronted defendant the morning she disappeared and informed him that she wanted a divorce, leaving her wedding set on the bathroom counter. All of these things would have indicated to defendant that Janet was really leaving this time, which was alleged to have provided him with a motive to kill her. As in *Simpson*, here, the People "were entitled to present evidence tending to establish motive. Without persuasive

evidence . . . regarding motive, the jurors might believe there was nothing in the relationship . . . which would precipitate a murder." (*Simpson, supra,* 86 Cal.App.4th at p. 595.)

Second, defendant suggested to homicide detectives on several occasions that Janet either committed suicide or simply abandoned him and the children. His theory at trial was that she was a "troubled" and "emotional" young woman who "loved [him] dearly," and might have been so upset by their discussion of divorce that she decided to "go out for a walk" and never come back. However, the idea that Janet would have committed suicide or abandoned her family is inconsistent with her stated fear of defendant because she was afraid not only for herself but also for the safety of her children. Either scenario suggested by defendant would have meant that she voluntarily left her children with him. Thus, the People were entitled to elicit Janet's statements of fear to refute defendant's claim that she behaved in a manner inconsistent with that fear. (*Escobar, supra,* 82 Cal.App.4th at p. 1103.)

We also reject defendant's assertion that these statements should have been excluded under section 352 because they were too prejudicial.[4] In determining whether an out-of-court statement offered as circumstantial evidence of the victim's state of mind should be excluded under this provision, the trial court "may consider such things as the prejudicial nature of the conduct attributed to [the defendant]; the demeanor of the declarant as described by the witnesses and other circumstances attendant to the making of the statement; and whether the circumstances of the statement are such that the jury will be unable to follow the limiting instruction. If the court concludes that the jury will be unable to use the evidence solely within its limitations, the court should exercise its discretion and exclude the evidence." (*Ortiz, supra,* 38 Cal.App.4th at p. 392.)

The statements challenged in this case are far less prejudicial than the statements at issue in *Simpson, supra,* 86 Cal.App.4th 573. The only conduct attributed to defendant in these statements is that he told Janet that he would be able to keep the children if she were to leave him because of his position in law enforcement. While the statements generally portray defendant as a controlling husband, express Janet's fear of "what might happen" if she left him or otherwise went against his wishes, and assert that there would be "hell to pay" if she did so, they do not describe any specific incident in which Janet actually paid the price for going against his wishes. "A clear limiting

---

[4] Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

instruction can, in large part, dispel prejudicial use of such evidence." (*Ortiz, supra,* 38 Cal.App.4th at p. 390.) Such an instruction was given. We cannot conclude that the trial court abused its discretion in finding that the jury would be able to follow it.

## III

### *Evidence Relating to the Dog-kicking Incident*

Defendant also challenges the admission of all evidence relating to the dog-kicking incident. He argues that this evidence was inadmissible under section 1101 because it was admitted to prove that he had kicked the family dog to death, and was therefore "the type of person who could, and did, explode in anger and kill his wife upon slight provocation." Not so.

The People presented evidence relating to the dog-kicking incident in several forms: (1) Janet's statements that defendant had kicked the dog to death, which were not offered for their truth, but rather as circumstantial evidence of her state of mind; (2) defendant's statements to detectives in which he admitted to kicking the dog as a form of discipline, but denied causing the animal's death; (3) testimony from the veterinarian, Dr. Jan Hershenhouse, in which she described the dog's death, stated that she saw no signs of external trauma, but also stated that an autopsy had not been performed and that she could not rule out that the animal died from being kicked; and (4) testimony from Dr. Symes in which he explained that he had examined the dog's bones in 2005 and found no indication of blunt force trauma, but because the bones had deteriorated significantly while in the ground, he could not express an opinion as to the cause of death.[5]

Defendant moved in limine to exclude all reference to Janet's claim that defendant was responsible for the death of the family dog. He argued that her statements regarding the matter were "not trustworthy" and "appear[ed] to be

---

[5] Defendant also presented evidence relating to the dog-kicking incident. He elicited testimony from defense expert and veterinary pathologist, Dr. William Spangler, in which the doctor stated that he did not believe the dog died from acute trauma, and that multiple fractures in the dog's bones were likely caused by the weight of the soil on the animal's body after it was buried. He also elicited testimony from Detective Boon, in which the detective explained that he was told by another officer that Kristi had said that defendant kicked the dog like a soccer ball and threw the animal around. Finally, he elicited testimony from Kristi, in which she denied observing her father abuse the dog and also stated that she did not remember telling the investigating officers anything about his treatment of the animal. Of course, defendant cannot complain that testimony he elicited was admitted into evidence. (*People v. Williams* (2009) 170 Cal.App.4th 587, 620 [88 Cal.Rptr.3d 401] [challenged testimony was elicited by defendant's counsel; "any error was invited, and defendant may not challenge that error on appeal"].)

a way by the prosecution to introduce proscribed character evidence barred under [section] 1101." He also asked the trial court to exclude the portions of his statements to police in which he admitted to kicking the dog.

The trial court denied the motion, explaining that Janet's statements that she feared defendant because she witnessed him violently assault the dog would be admitted pursuant to section 1250 and as circumstantial evidence of her state of mind. The trial court found her statements to be trustworthy because defendant admitted to kicking the dog. While defendant also denied causing the dog's death, the trial court explained: "Whether the defendant actually killed the dog is not relevant in the court[']s view. What is relevant is how [Janet] would have reacted to witnessing the assault and whether it was the catalyst for her to decide to leave her husband on the morning of September 8th." The trial court also found the evidence to be admissible under section 352 because "defendant's assault on the dog was relatively close in time to [Janet's] disappearance and thus highly probative of her fear and decision to terminate the relationship. Thus, the probative value is not substantially outweighed by the risk [of] undue prejudice to the defendant."

### Janet's Statements

The trial court properly admitted Janet's statements concerning defendant's assault on the dog as circumstantial evidence of her state of mind. While several such statements were admitted, for our purposes one example will suffice. After the dog-kicking incident, Janet called her brother Gary in tears, told him that defendant had kicked the dog to death, and explained that "she was starting to feel threatened at home, and she was worried for her safety, and she was worried for Kristi and John."

As we have explained, the portion of the statement in which Janet expressed concern for her safety and for that of her children was admissible hearsay under section 1250 because her mental state was at issue in this case. The portion of the statement in which she claimed that defendant had kicked the dog to death was not offered for its truth, i.e., that defendant had in fact kicked the dog to death, but rather as circumstantial evidence of her state of mind. Whether true or not, the fact that the statement was made was relevant to Janet's mental state. (*Ortiz, supra*, 38 Cal.App.4th at p. 389.) The jury was properly admonished that the statement was not received for the truth of the matter stated and could be used only as evidence of her state of mind.

■ Nor did the trial court abuse its discretion in concluding that the evidence was admissible under section 352. This statement, unlike the general statements that Janet feared "what might happen" if she left defendant or went against his wishes, does assert personal knowledge of a past act of the

defendant. "In this situation, it is more difficult to fashion, and more demanding to expect the jury will follow, a limiting instruction. The jury can only legitimately conclude the declarant feared [defendant] if the statement is truthful. However, the jury would have been instructed not to consider the statement itself as true, because it is not admitted for its truth, but only as circumstantial evidence of state of mind. The difficulty is compounded the more inflammatory the prior conduct." (*Ortiz, supra,* 38 Cal.App.4th at p. 390.) If the trial court concludes that the jury will be unable to follow such an instruction, it should exercise its discretion and exclude the evidence under section 352. (38 Cal.App.4th at p. 392.)

Here, as the trial court correctly observed, Janet's statement that defendant kicked the dog to death is highly probative of her fear of defendant, both for herself and for her children, shortly before she disappeared. As already mentioned, such a fear is inconsistent with defendant's theory that she simply abandoned him and the children. While the prior conduct was fairly inflammatory, it was not unreasonable for the trial court to conclude that the jury would be able to use the statement solely as evidence of Janet's state of mind. The jury would have understood that the entire statement was not based on personal knowledge because the veterinarian did not even know whether the dog died from being kicked. The only portion of the statement based on her personal knowledge was the claim that defendant kicked the dog. But defendant admitted to kicking the dog. The jury could reasonably have used defendant's admission for its truth, and limited its use of Janet's statement to prove her state of mind. Thus, as was the case in *Ortiz,* "[t]he statements were made under circumstances indicating their trustworthiness. While obviously prejudicial to [defendant] (in the sense contemplated by section 352), this evidence was also highly probative of her attitude toward him. On balance, we cannot say the trial court abused its discretion in allowing these statements into evidence." (*Ortiz, supra,* 38 Cal.App.4th at p. 394.)

### *Defendant's Admissions*

■ The trial court also properly admitted defendant's statements to detectives, in which he admitted to kicking the dog, but denied causing the animal's death. Evidence of a statement made by a defendant in a criminal action is not made inadmissible by the hearsay rule when offered against that defendant, and may therefore be admitted for the truth of the matter asserted in the statement. (§ 1220; *People v. Smith* (1984) 151 Cal.App.3d 89, 96 [198 Cal.Rptr. 623].) Nevertheless, defendant argues admission of evidence of the dog-kicking incident violates section 1101 because it amounts to evidence of his violent character offered to prove that he acted in conformity with that character in killing Janet. We disagree.

■ Section 1101, subdivision (a), generally provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, subdivision (b) of that section provides that a specific instance of a person's conduct is admissible "when relevant to prove some fact (such as motive, . . . intent, . . . identity . . .) other than his or her disposition to commit such an act." (§ 1101, subd. (b).)

■ "Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors." (*People v. Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317]; see *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1612 [38 Cal.Rptr.2d 868].) This is because evidence showing "quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense. [Citations.] Likewise, evidence of threats of violence by an accused against the victim of an offense of violence is proof of the identity of the offender." (*People v. Daniels* (1971) 16 Cal.App.3d 36, 46 [93 Cal.Rptr. 628]; see *People v. Shaver* (1936) 7 Cal.2d 586, 592 [61 P.2d 1170]; *People v. De Moss, supra*, 4 Cal.2d 469, 473.)

Thus, the trial court properly admitted evidence of prior incidents of domestic violence perpetrated by defendant against Janet. But the question remains as to whether evidence of the incident in which defendant violently kicked the family dog amounts to an act of abuse against Janet, such that it falls within the above cited rule. If it does, then it is admissible not only under section 1101 to prove his motive, but also under section 1109 to prove his propensity to commit the murder. For the following reasons, we hold that it does.

Section 1109, subdivision (a)(1), provides: "Except as provided in subdivision (e)[6] or (f),[7] in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Subdivision (d)(3)

---

[6] Section 1109, subdivision (e) provides: "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

[7] Section 1109, subdivision (f) provides: "Evidence of the findings and determinations of administrative agencies regulating the conduct of health facilities licensed under Section 1250 of the Health and Safety Code is inadmissible under this section."

of this section provides: " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (§ 1109, subd. (d)(3).)

Penal Code section 13700, subdivision (b), defines "domestic violence" to mean "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." Subdivision (a) of this provision defines "abuse" to mean "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

■ Family Code section 6211 expands the definition of "domestic violence" to include abuse committed against a "child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected," and "[a]ny other person related by consanguinity or affinity within the second degree." Family Code section 6203 expands the definition of "abuse" to include "engag[ing] in any behavior that has been or could be enjoined pursuant to [Family Code] Section 6320." And Family Code section 6320, subdivision (b) authorizes the court to issue a protective order regarding "any animal owned, possessed, leased, kept, or held by either the petitioner or the respondent or a minor child residing in the residence or household of either the petitioner or the respondent," and further authorizes the court to enjoin the respondent from "molesting, attacking, striking, threatening, harming, or otherwise disposing of the animal."

■ In *People v. Ogle* (2010) 185 Cal.App.4th 1138 [110 Cal.Rptr.3d 913], the Court of Appeal held stalking to be an act of domestic violence within the meaning of section 1109, and therefore admissible to prove propensity to commit the crime of making criminal threats. (*Ogle*, at p. 1140.) The court explained that "[s]ection 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition," and further explained: "Family Code section 6211 defines domestic violence to require abuse and Family Code section 6203 . . . defines 'abuse' to include 'engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320.' Family Code section 6320 authorizes the court to enjoin a party from 'stalking, threatening, . . . harassing, [and] telephoning,' the other party. Thus, stalking a former spouse is domestic violence for purposes of section 1109 as defined by Family Code

section 6211." (*Id.* at p. 1144, citing *People v. Dallas* (2008) 165 Cal.App.4th 940, 952 [81 Cal.Rptr.3d 521].)

Similarly, in *People v. Brown* (2001) 96 Cal.App.4th Supp. 1 [117 Cal.Rptr.2d 738], the Court of Appeal held that vandalism was an act of domestic violence under the Family Code where the defendant smashed most of the windows in his wife's car after an argument while the wife walked away from the vehicle. (*Id.* at pp. Supp. 39–40.) This was because "Family Code section 6203 defines 'abuse' in relevant part as '[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320.' [Citation.] Family Code section 6320 provides in relevant part that '[t]he court may issue an ex parte order enjoining a party from molesting, attacking, striking, . . . *destroying personal property* . . . of the other party. . . .' . . ." (*Id.* at p. Supp. 39, fn. 6.) The court also rejected the defendant's argument that his wife was not the victim of the vandalism, explaining that such a position was "inconsistent with common sense, as well as the language and purpose of the relevant statutes." (*Id.* at p. Supp. 39.)

In this case, defendant told Detective Boon and Inspector Smith that he "went overboard" kicking the dog and "shouldn't have gone that far." He told them that he kicked the animal as a form of discipline after the dog got into some garbage, that he did not believe the dog died from the kicking, and that Janet did not see anything that she had not seen on numerous prior occasions. He confirmed to Detective Davinroy that he "often" kicked the dog. He told Agent O'Farrell that the children were also present when he kicked the dog, and that seeing him kick the animal was not "out of the ordinary."

As already mentioned, Family Code section 6320 authorizes the court to issue a protective order regarding "any animal owned, possessed, leased, kept, or held by either the petitioner or the respondent or a minor child residing in the residence or household of either the petitioner or the respondent," and further authorizes the court to enjoin the respondent from "molesting, attacking, striking, threatening, harming, or otherwise disposing of the animal." Thus, defendant's assault on the family dog amounted to "abuse" within the meaning of Family Code section 6203. This abuse was committed against his wife and children, who witnessed the violent assault, and amounted to "domestic violence" within the meaning of Family Code section 6211. Indeed, as domestic violence expert Marjorie Cusick testified, in an abusive relationship—which independent evidence established defendant and Janet's relationship to be—harming an animal is "a very high-level threat to the victim as to the ability of the perpetrator to not only threaten to do something incredibly harmful but to actually act it out in front of them." Defendant's statements regarding his assault on the family dog were admissible under section 1101 to prove his motive, and under section 1109 to prove his propensity to commit the murder.

■ Nor were the statements rendered inadmissible by section 352. "In a case where the identity of a person who commits a crime is attempted to be proven by circumstantial evidence, such as in the case at bar, evidence of a motive on the part of a defendant charged is always a subject of proof, and the fact of motive particularly material." (*People v. Argentos* (1909) 156 Cal. 720, 726 [106 P. 65]; *People v. Daniels, supra*, 16 Cal.App.3d at p. 46.) Evidence of prior acts of domestic violence against Janet, including defendant's statements regarding his assault on the dog, was highly probative of motive and identity. The trial court did not abuse its discretion in allowing these statements into evidence.

### Testimony of Drs. Hershenhouse and Symes

Dr. Hershenhouse testified that she witnessed the dog's death when it was brought into the animal clinic. She described the dog's death, stated that she saw no signs of external trauma, but also stated that an autopsy had not been performed and that she could not rule out that the animal died from being kicked. Dr. Symes testified that he examined the dog's bones in 2005 and found no indication of blunt force trauma, but because the bones had deteriorated significantly while in the ground, he could not express an opinion as to the cause of death. We agree with the trial court's ruling that "[w]hether the defendant actually killed the dog is not relevant . . . ." However, because the testimony of Drs. Hershenhouse and Symes is consistent with defendant's claim that the dog died from poisoning, and in no way suggests that the animal died from a violent assault, we cannot conclude that defendant was in any way prejudiced by the admission of this evidence.

### IV

### Expert Testimony

We also reject defendant's assertion that the trial court erred by allowing expert testimony from domestic violence expert Marjorie Cusick. And while Cusick's testimony did exceed the limitations imposed by the trial court, we find no prosecutorial misconduct.

### Background

Defendant moved in limine to exclude Cusick's testimony, which the People argued was "relevant and probative to explain to the jury why Janet would choose to stay with the defendant for as long as she did despite physical and verbal abuse on several prior occasions, as well as why she did not immediately report the domestic violence to the police." The trial court

denied the motion, allowing the testimony with the following restriction: "The witness may not, however, express any opinion about the particular facts of this case or give her opinion regarding the state of mind of either the defendant or his wife."

During trial, the People provided an additional offer of proof regarding Cusick's testimony, arguing that the testimony was needed to disabuse the jury of the common misconception that it is easy for a battered spouse to leave an abusive marriage. This testimony was crucial because there was evidence that Janet expressed her fear of defendant as early as 1979, and "the core misconception that the jury might have is that people who are fearful will just leave, so if she was so fearful in 1979, why didn't she just leave? If she was so fearful on August 22, 1982, why didn't she just leave then? Why did she continue to live in that house?" The prosecutor also pointed out that the defense had called into question Janet's credibility with respect to her statements of fear by asking "if she was so fearful, why did she confront the defendant the morning of September 8th?"

The prosecutor argued that Cusick's testimony would help the jury to understand Janet's seemingly inconsistent conduct by explaining the "counterintuitive" fact that "victims of various kind[s] of abuses will return to their perpetrator, will stay in the relationship with their perpetrator until they're ready to make that decision" to leave. When asked to provide examples of such conduct, the prosecutor answered: "For example, that she was so fearful August 22nd, the dog dies in front of her, and shortly thereafter she is telling people, sobbing, crying, telling them that she's afraid of the defendant. . . . It is the inconsistency that she's still living at that home after she has observed this and is fearful of the defendant based on that kick of the dog." The prosecutor argued that despite the fact that Janet's death precluded her from testifying at trial, Cusick's testimony was nevertheless necessary to enable the jury to assess the credibility of her various out-of-court statements.

The trial court again ruled that the testimony was admissible, noting that "the prosecution's theory of the case is that [Janet] was in an abusive relationship with her husband wherein he attempted to exercise power and control over her causing her to be afraid," which "caused her to make the decision to leave him and take the children, which thereby motivated him to kill her." After ruling that there was sufficient foundational evidence that Janet and defendant may have been in an abusive relationship, the trial court ruled that Cusick's testimony was admissible under sections 801 and 1107: "The defendant in this case has attacked the credibility of [his wife]. For instance, the defendant contends that her statements concerning the fact that the defendant kicked the dog to death were fabricated by her. The defendant has suggested that if she was really in an abusive relationship, then why did

she return or why did she not leave him?" The trial court then explained that because "marital relationships are often behind closed doors" and involve "complex psychological relationships that sometimes defy logic or reason," Cusick's testimony would help the jury assess Janet's credibility by "dispelling some of the possibl[e] misconceptions held about abused women." This would also help the jury to decide "whether the defendant may have had a motive to kill his wife."

However, the trial court placed additional limitations on the testimony, explaining that Cusick "may testify about the psychological aspects that occur between victim and abuser at points when there may be a separation, but cannot make an opinion that this is the particular time when the abuser would kill the victim." The trial court also explained to the prosecutor that "it would be inappropriate in this case given the possible prejudicial effect to the defendant to give the jury hypotheticals that involve actual facts from this trial."

Prior to Cusick's testimony, the trial court admonished the jury as follows: "Her testimony about intimate partner abuse is not evidence that the defendant abused [his wife] or killed her. You may consider this evidence only in deciding whether or not [Janet's] conduct was not inconsistent with the conduct of someone who has been abused and in evaluating the believability of her statements." We will describe Cusick's testimony in detail in the analysis that follows.

*Analysis*

Section 801, subdivision (a), permits expert testimony on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Section 1107, subdivision (a), provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

"The Legislature, courts, and legal commentators have noted the close analogy between use of expert testimony to explain the behavior of domestic violence victims, and expert testimony concerning victims of rape or child abuse." (*People v. Brown* (2004) 33 Cal.4th 892, 905 [16 Cal.Rptr.3d 447, 94 P.3d 574] (*Brown*).) In *People v. Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], our Supreme Court held expert testimony concerning the behavior of rape victims to be admissible under section 801

"to rebut misconceptions about the presumed behavior of rape victims," but not "as a means of proving—from the alleged victim's post-incident trauma—that a rape in the legal sense had, in fact, occurred." (*Bledsoe*, at pp. 248, 251.) In *People v. McAlpin* (1991) 53 Cal.3d 1289 [283 Cal.Rptr. 382, 812 P.2d 563], a case involving the defendant's sexual abuse of a child, our Supreme Court explained: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at pp. 1300–1301, fn. omitted; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [249 Cal.Rptr. 886] ["where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust"].)

In *Brown, supra*, 33 Cal.4th 892, our Supreme Court permitted expert testimony about the "cycle of violence" in an abusive relationship. The defendant was convicted of making a criminal threat, false imprisonment by violence, and misdemeanor battery on his cohabitant girlfriend, Pipes, whose trial testimony differed from the account she gave to police immediately following the incident. (*Id.* at pp. 896–898.) At trial, the prosecution was allowed to present expert testimony describing "the tendency of domestic violence victims to recant previous allegations of abuse as part of the particular behavior patterns commonly observed in abusive relationships." (*Id.* at p. 907.) The expert testified about the " 'cycle of violence,' " which "does not necessarily begin with physical abuse. Most abusive relationships begin with a struggle for power and control between the abuser and the victim that later escalates to physical abuse. The initial 'tension building stage' of the cycle can appear in deceptively mundane ways, such as complaints about the cleanliness of the house. Often the abuser uses psychological, emotional, or verbal abuse to control the victim. When the victim tries to leave or to assert control over the situation, the abuser may turn violent as an attempt to maintain control. Later, even if there has been no other episode of violence, the victim may change her mind about prosecuting the abuser and may recant her previous statements." (*Ibid.*)

Our Supreme Court held this testimony was admissible under section 801, explaining: "When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness.

[Citations.] And when the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor. [Citations.] These are common notions about domestic violence victims akin to those notions about rape and child abuse victims that this court discussed in *People v. Bledsoe, supra*, 36 Cal.3d 236 and [*People v.*] *McAlpin, supra*, 53 Cal.3d 1289, and that the Court of Appeal discussed in *People v. Housley* [(1992)] 6 Cal.App.4th [947], 955–956 [8 Cal.Rptr.2d 431][, where expert testimony was held to be admissible to explain a child's recantation of her molestation claim]." (*Brown, supra*, 33 Cal.4th at pp. 906–907.)

The court also explained that there was an adequate foundation for the testimony "because evidence presented at trial suggested the possibility that defendant and [the victim] were in a 'cycle of violence' of the type described by [the expert]. Pipes told [a detective] that defendant had complained about the cleanliness of the apartment on the evening of the assault. There was also evidence that Pipes and defendant also argued that evening about defendant's failure to take her side in an argument with his cousin (their landlord) regarding the rent, that defendant told Pipes that if she did not pay the rent she would have to move out, and that he later threatened to kill her if she did leave. Finally, there was evidence that when Pipes actually tried to leave the apartment, defendant assaulted her. To assist the jury in evaluating this evidence, the trial court properly admitted the expert testimony . . . ." (*Brown, supra*, 33 Cal.4th at p. 907.)

In this case, Cusick testified generally about "intimate partner abuse," defining that term as "a dynamic between two intimate partners where one of the partners tries to exert power and control over the other, and they try to exert that power and control by using a pattern and variety of abuses, and that can be physical abuse, emotional, psychological abuse, financial abuse, fear and intimidation." As already mentioned, she explained that abusing an animal can be a form of intimidation. She also explained that where children are involved, an abuser will often threaten to either take or harm the children, which is "the highest form of fear and intimidation that's used in families where there are children." She also provided examples of various forms of psychological abuse, emotional abuse, sexual abuse, financial abuse, and physical abuse.

Cusick also testified about the "cycle of violence," explaining that there are three stages: (1) an "acute-battering incident," followed by (2) a "honeymoon or contrite stage," followed by (3) a "tension-building phase." This tension-building phase ultimately leads to another acute-battering incident, which continues the cycle indefinitely. She also explained that victims generally

behave differently during the three stages. Immediately following the battering incident, the victim will typically reclaim some power from the abuser, either by threatening to leave if it happens again or by actually leaving the relationship. During the honeymoon stage, the victim will recommit to the relationship, which immediately relinquishes some power to the abuser. However, some of the victim's power remains, resulting in the reduction of certain aspects of control previously present in the relationship, sometimes for weeks or months. During the tension-building phase, the abuser attempts to reclaim the remainder of the victim's power by increasing the control exercised over the relationship. And because the victim does not want to trigger another acute-battering incident, he or she typically accommodates the abuser's demands.

Cusick also described several common misconceptions concerning victims of intimate partner abuse, including the idea that "it is easy to leave a relationship where there is domestic violence," and "once you leave an abusive relationship that you don't have to have contact with the abuser, and that's a myth when there's children involved." As she explained: "They're afraid to leave. Part of the intimidation of fear is being told generally quite often that 'if you ever leave me, I will do something really horrible to you. I will do something horrible to your family and friends. I will take the children or do something horrible to the children.' [¶] And victims read about things like this in the paper, and they see on television and they know it's true. They know the most lethal time in a [domestic violence victim's] life is right when they leave, and they have to be incredibly careful during that period of time, and they are putting themselves and their kids at risk. [¶] Also, if you have children, you leave an abuser, you are still connected to the abuser, but you have very much pissed the abuser off because many abusers say, 'You can leave, but you can't leave with the children. And you'll never get the kids,' so in leaving and taking the kids with you is a huge risk at escalating the anger of the abuser."

Cusick further explained that "victims develop what's known as coping strategies or coping mechanisms to allow them to stay in these relationships," including denying, minimizing, or rationalizing the abuse. According to Cusick, the abuser will play into these coping mechanisms by denying or minimizing the victim's experience, or by blaming the battering incident on the victim, which is part of the psychological and emotional abuse that exists in these relationships.

Defendant's challenge to this evidence is twofold. He argues that "the threshold error was the trial court's ruling permitting Cusick to take the stand in the first place." He then argues that this threshold error "resulted in the prosecution running roughshod over the trial court's efforts to prevent the gross misuse of her testimony."

The trial court did not abuse its discretion in allowing Cusick's testimony under sections 801 and 1107. As defendant points out, this case is different from those discussed above because Janet's death precluded her from testifying at trial. However, we agree with the trial court that her credibility was nevertheless at issue. On numerous occasions, Janet stated that she was afraid of defendant. These statements were admitted for their truth under section 1250. Janet also told White-Janoski that defendant hit her with a metal chain. This statement was admitted for its truth under section 1240. However, defendant claimed that her conduct, i.e., staying in the relationship and returning to him on two prior occasions, was inconsistent with her stated fear and also inconsistent with her statement that he had physically abused her. Cusick's testimony was necessary to disabuse jurors of commonly held misconceptions about victims of domestic violence, and to explain the psychological reasons for such a victim's seemingly self-impeaching behavior. (See *People v. McAlpin, supra,* 53 Cal.3d at pp. 1300–1301.)

 And while we agree with defendant that Cusick's testimony exceeded the limits imposed by the trial court, we disagree that this amounted to prosecutorial misconduct. " 'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) But this record does not disclose any intentional misconduct on the part of the prosecutor. Indeed, the prosecutor informed Cusick prior to her testimony that she was not allowed to testify "that victims of domestic violence are killed purposefully at a particular point in time." Cusick violated this directive by testifying that domestic violence victims "know the most lethal time in [their] life is right when they leave, and they have to be incredibly careful during that period of time, and they are putting themselves and their kids at risk." However, the question that triggered this violation was simply, "why don't victims of abuse just leave?" This question was properly aimed at dispelling a common misconception held about abuse victims, i.e., that it is easy for them to leave an abusive relationship. Cusick could have answered that question without violating the trial court's ruling.

Defendant also complains that the prosecutor asked Cusick whether certain abusers have more education regarding domestic violence, prompting Cusick to respond: "Well, generally perpetrators who are in position[s] of power and privilege can be educated in terms of the court system, in terms of having more resources, in terms of, let's say, a doctor knowing where on the body bruises would occur. In terms of a police officer knowing how to use their body and their voice and their facial expression to be intimidating." When the prosecutor followed up by asking whether her experience with police officer abusers changed any of the types of abuse she had already discussed, the trial court sustained a defense objection and admonished the prosecutor: "I'm going to limit your direct examination to the areas of general abuse the

witness has been describing and not to the particular possible facts of this case." While expert testimony on domestic violence may include general descriptions of abuser behavior in order to "explain the victim's actions in light of the abusive conduct" (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 595 [92 Cal.Rptr.2d 890]), this testimony specifically referred to police officers and was not aimed at elucidating victim conduct in order to dispel any common misconception. However, we do not believe that this misstep by the prosecution rises to the level of prosecutorial misconduct.[8]

In any event, there was no prejudice to defendant. All inquiry into police officers as abusers was promptly shut down by the trial court. And following the statement regarding leaving an abuser as being a "lethal time," the trial court provided the jury with the following admonition: "The [c]ourt has allowed the testimony of . . . Cusick on the topic of abusive relationships in general. The witness has described various types of abuse and how victims generally react. This is not evidence, however, that the defendant was an abuser or that he killed [his wife], and you must look to other evidence presented in this trial to make that determination. You may only consider this evidence in deciding whether or not [Janet's] conduct was not inconsistent with the conduct of someone who has been abused and in evaluating the believability of her statements." We presume the jury followed this instruction. (*People v. Sanchez* (2001) 26 Cal.4th 834 [111 Cal.Rptr.2d 129, 29 P.3d 209]; *People v. Holt* (1997) 15 Cal.4th 619, 662 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Moreover, to the extent the jury relied on Cusick's testimony to conclude defendant abused his wife, and therefore had a motive to kill her, other evidence would likely have yielded the same conclusion. (See *People v. Bowker, supra*, 203 Cal.App.3d at p. 395.)

---

[8] Defendant also complains that the prosecutor elicited testimony about animal abuse. However, as he did not claim that eliciting such testimony amounted to prosecutorial misconduct below, he cannot do so on appeal. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 176 [64 Cal.Rptr.3d 163, 164 P.3d 590].) In any event, we conclude that Cusick's testimony concerning animal abuse in general was properly admitted. When expert testimony concerning domestic violence is properly admitted to explain the victim's conduct in light of the abuse, "testimony about the hypothetical abuser and hypothetical victim is needed for the [victim's conduct] to be understood. . . . [L]imiting the testimony to the victim's state of mind without some explanation of the types of behaviors that trigger the [victim's conduct] could easily defeat the purpose for which the expert is called . . . ." (*People v. Gadlin, supra*, 78 Cal.App.4th at p. 595.) Cusick's testimony about animal abuse was part of her general testimony about the types of abuses that may or may not exist in abusive relationships. And without this testimony, the jury might not have understood that abusing an animal is taken to be a form of threat *to the victim*, which would cause the victim to be afraid of leaving the relationship. Thus, the trial court did not abuse its discretion in allowing this testimony, and the prosecutor did not engage in misconduct by eliciting it.

V, VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Raye, P. J., and Blease, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 14, 2012, S199436.

---

*See footnote, *ante*, page 863.