Filed 11/10/20  P. v. Frasco CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL CORTES FRASCO,<br><br>        Defendant and Appellant. | E070910<br><br>(Super.Ct.No. RIF1605314)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr. Judge.

Affirmed in part, reversed in part with directions.

Julie Anne Swain and Julie Swain for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

Defendant and appellant, Miguel Frasco, Jr., appeals from judgment entered following jury convictions for domestic violence (Pen. Code, § 273.5, subd. (a); counts 1 & 2); false imprisonment (Pen. Code, § 236; count 3); assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts 5 & 8); possession of a firearm (Pen. Code, § 29800, subd. (a)(1); counts 6 & 10); domestic battery (Pen. Code, § 243, subd. (c)(1); count 7); making a criminal threat (Pen. Code, § 422; count 9); stalking while under a restraining order (Pen. Code, § 646.9, subd. (b); count 11); and intentional violation of a protective order (Pen. Code, § 273.6, subd. (a); counts 12, 13, & 14).[1] The jury also found true allegations as to counts 3 and 9, that defendant personally used a firearm (Pen. Code, §§ 12022.5, subd. (a), 1192.7, subd. (c)(8)). The trial court sentenced defendant to 12 years in prison.

Defendant contends the trial court abused its discretion in permitting expert testimony on intimate partner battering as propensity evidence. Defendant also argues the trial court erred in excluding evidence of text messages from the victim to defendant, and the trial court abused its discretion by denying defendant's request to present surrebuttal evidence. Defendant further contends the court-ordered fines and fees must be reversed and the matter remanded under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) for an ability to pay hearing.

---

[1] Count 4 was dismissed by motion of the People.

We reject defendant's evidentiary challenges but reverse the trial court's order imposing fines and fees, and remand the matter to the trial court with directions to conduct a hearing to determine whether defendant is able to pay the court-ordered fines and fees. The judgment is affirmed in all other respects.

## II.

## FACTS

Defendant and M.M. began dating in March 2015. They never married but had a child together, born in June 2016. Defendant and M.M. lived together on and off. Beginning in July 2015, they lived in a guesthouse on defendant's parents' property. Defendant began physically abusing M.M. in September 2015, about the time M.M. became pregnant with the couple's daughter.

A. *September 5, 2015 Incident (Count 1)*

In September 2015, M.M. went out to dinner and to a few clubs with a girlfriend. M.M. invited defendant to join them but he did not want to go. While M.M. was out, defendant sent M.M. numerous texts insulting her, calling her a "whore," and suggesting she was going out to have sex with other men. When M.M. arrived home at 4:00 a.m. on September 5, 2015, defendant was waiting for her at the front gate of her house. He grabbed her by the arm and dragged her into the house. He then started yelling at M.M., punched her with a closed fist on the left side of her face, and hit her two more times, causing M.M. to fall to the ground. Defendant dragged M.M. by her hair while continuing to punch and kick her.

3

Defendant's parents heard M.M. screaming and yelled at defendant from outside the house to stop. M.M. got up and ran out the door to defendant's parents' adjacent house. M.M. screamed for defendant's niece to help her. The niece took M.M. to her bedroom and locked the door. Defendant followed M.M. into his parents' home and banged on the niece's bedroom door. He demanded the niece open the door and threatened to break it down. When the niece relented and unlocked the door, defendant entered. He hit and repeatedly slapped M.M., pulled her hair, and spat in her face. Defendant told his mother he was attacking M.M. because she was a whore for coming home so late. Eventually defendant stopped and left his parents' home. He went to the guesthouse (M.M.'s home) and burned M.M.'s clothing and other belongings.

Later that day, defendant stopped by and apologized to M.M. M.M. sustained a black eye and three bumps on her head from the incident. She did not report the incident to the police until almost a year later, in August 2016.

B. *January 6, 2016 Incident (Count 2)*

On January 6, 2016, defendant and M.M. went to dinner at the Market Broiler M.M. was about six weeks pregnant. During dinner, defendant argued with M.M. and called her names. M.M. left the restaurant and went next door to Marie Callender's. Defendant followed her. M.M. went into the restroom to avoid defendant. While banging on the restroom door, defendant told M.M. to come out and said he was waiting for her. Scared, M.M. called her sister, Nora, and asked her to pick her up. Defendant entered the restroom, kicked in M.M.'s stall door, and broke the stall door latch. When

4

M.M. screamed, defendant grabbed her face and mouth, and pushed her up against the wall.  M.M. bit defendant's hand.  Defendant demanded M.M.'s phone, which M.M. gave to him.  Defendant then left.  M.M.'s mouth and face were injured.  M.M. took pictures of her face injuries but did not report the incident until August 2016.  Later, defendant apologized.

C.  *March 2016 Incident (Counts 3, 5, & 6)*

In March 2016, while M.M. was pregnant, M.M. and defendant argued, and M.M. told defendant she was leaving him.  Defendant told M.M. she could leave but their baby had to stay with him.  Defendant locked the front door and would not let her leave.  Defendant drafted an agreement stating that M.M. was giving up her rights to their child and agreeing that the child would live with defendant.  Defendant demanded M.M. sign the agreement.  M.M. refused to sign it.  Defendant retrieved his gun from the nightstand, held it to M.M.'s head, and pushed the gun into M.M.'s temple.  M.M. began crying, hyperventilating, and coughing, and then ran to the bathroom to throw up.  Defendant apologized and made M.M. a cup of tea.

Shortly after the March incident, M.M. moved in with her parents.  She also went to court to obtain a restraining order but did not follow through with it because defendant told her things would change.

D.  *June 12, 2016 Incident (Count 7)*

On June 12, 2016, M.M. and defendant went to a prenatal doctor appointment.  M.M. went by herself because defendant was not ready to leave on time, and defendant

5

showed up late, after the appointment was over.  Defendant and M.M. argued outside the doctor's office and as they went to the parking lot.  Defendant asked for the keys to his car.  M.M. threw the keys on the ground.  Defendant grabbed M.M.  She told him to leave her alone.  As M.M. walked away, defendant grabbed M.M.'s cup of iced coffee and threw her drink on her back.  M.M. ran away.  Defendant chased her and placed her in a headlock and yelled in her ear.  A woman driving by stopped, got out of her car, yelled at defendant to leave M.M. alone, and offered to give M.M. a ride.  M.M. got in the woman's car and was dropped off at M.M.'s sister's workplace.

E.  *June 19, 2016 Incident (Counts 8, 9, & 10)*

While M.M. was hospitalized for a couple of days after the birth of defendant and M.M.'s child in June 2016, defendant and M.M. began arguing when M.M. was about to be discharged.  M.M. told defendant she wanted to take the baby to her parents' house so they could help her with the baby.  Defendant wanted M.M. and the baby to go to his house.  Defendant threw a water bottle at M.M.  M.M. started to cry.  Defendant and M.M. went with the baby to defendant's house but M.M. then took the baby to her parents' (MGPs) house.  She told defendant she and the baby would return in a few hours.

When defendant thought M.M. and the baby had not returned quickly enough, he went to MGPs' house and grabbed the baby from M.M.  Defendant pulled up his shirt to show M.M. his gun in his belt.  M.M. tried to call the police but got a busy signal.  M.M. feared defendant would shoot someone.  M.M.'s mother (MGM) pleaded with defendant

6

to return the baby and M.M.'s father (MGF) told M.M. to call the police again. When M.M. called again and defendant heard M.M. speaking to the 911 operator, he handed the baby to MGM. Defendant then pulled out his gun, cocked it, pointed it at M.M., and told her she was going to "pay for this."

By the time the police arrived, defendant had left. M.M. reported the incident to the police but said she did not want to press charges because she feared it would make him angrier with her. A few days later defendant sent M.M. flowers and chocolates and apologized. M.M. was hopeful defendant would change and continued living with him on and off.

F. *September 12, 2016 Incident (Counts 12, 13, & 14)*

In August 2016, M.M. filed for a restraining order, during which M.M. reported defendant's acts of physical abuse summarized above. Defendant repeatedly violated the restraining order, which prohibited defendant from any contact with M.M., directly or indirectly.

On September 12, 2016, M.M. took her daughter to Walmart with her two sisters, Nora and Sally. On their way there, M.M. thought she saw defendant following them but was not sure. As M.M. and her sisters were leaving the Walmart parking lot in Nora's car, another car drove in front of Nora's car and cut her off. M.M. noticed the car was defendant's car and defendant was in the car. M.M. told her sisters the car was defendant's car. While defendant was stopped in front of Walmart, Nora drove up to defendant's car and Sally told defendant, "'Stop following us.'" M.M. and her sisters

7

then drove away. Defendant called Nora, who had Bluetooth in the car. M.M. heard defendant say, "'What the f*** you mean I'm following you guys? You're not that f****ing important.'" Nora told him not to call again and hung up. Defendant continued to call back but Nora did not answer his calls. He then started texting Nora five minutes later.

G. *November 2016 Incidents (Count 11)*

On November 2, 2016, M.M. reported to the police that defendant had been repeatedly calling her and leaving voicemail messages, in violation of the restraining order. During one call, defendant said, "'You f***ing bitch.'" During another call, he left a message stating, "'You'll see what's going to happen bitch.'"

On November 11, 2016, M.M. again reported to the police that defendant had been sending her text messages, in violation of the restraining order. One such text stated, "'We'll see who is going to laugh last. See what happens to who.'" M.M. testified the text messages made her feel harassed, threatened, and fearful.

H. *Expert Testimony on Domestic Violence*

Police Detective Christian Vaughn, who trained officers and professionals in the field of domestic violence, testified as an expert for the prosecution. He testified regarding the Power and Control Wheel, which he stated is based on a study of domestic violence victims. He also testified regarding the Cycle of Violence, which he explained represents the various stages commonly occurring in domestic violence cases. Detective Vaughn stated he was familiar with the common characteristics of domestic violence

8

abusers described in the Power and Control Wheel. Those behaviors of abusers include "'Using Coercion and Threats,'" "'Using Intimidation,'" "'Using Emotional Abuse,'" "'Using Isolation,'" "'Using Children,'" and "'Using Male Privilege.'"

Detective Vaughn further explained that victims of domestic violence do not always report to the police every incident, and there are no common characteristics of a domestic violence victim. Detective Vaughn acknowledged that, as an expert witness, he could not comment on the dynamics of the instant case. He could only provide generic or general testimony regarding domestic violence.

I. *Defense Testimony*

Defendant testified on his own behalf. He denied all of M.M.'s accusations that he had committed acts of violence against her. He also denied ever keeping M.M. from her family. Defendant testified the incident M.M. described happening at Marie Callender's never happened, and he never had a gun. Defendant denied ever requesting M.M. to sign any documents at gunpoint. As to the doctor appointment incident, M.M. threw keys at him, the coffee spilled on both of them, and he followed M.M. in an attempt to return the keys to M.M. Defendant denied ever putting M.M. in a headlock. As to the incident two days after their child's birth, defendant went to MGPs' home to take the baby so his family could visit with the child. Defendant stated that, because M.M. and her family accused him of kidnapping the baby when he tried to take the baby, he handed the baby to MGM and left. Defendant testified he was not following M.M. and her sisters to the Walmart and never texted Nora. However, Sheriff's Deputy

9

Cunanan testified that in September 2016, defendant admitted he had called Nora and told her he wasn't following her, and then texted Nora.

Defendant further testified that M.M. threatened to keep their child from him, and sent him e-mails and texts calling him names, telling him people would always believe a woman, and telling him he would not be able to see his daughter. Defendant testified M.M. sent an email stating that she was going to report he hit her and threatened to kill her and the baby, and she would be happy to see him in prison. In response, M.M. denied sending defendant the e-mails and texts.

Defendant acknowledged being arrested and convicted in 2005 of possessing narcotics while in possession of a firearm. M.M. acknowledged being convicted in 2009 of selling methamphetamine and lying to the police about her driver's license, which had been suspended. M.M. also admitted that while dating defendant, she had used methamphetamine but it did not prevent her from remembering the incidents that occurred during that time.

III.

EVIDENCE OF INTIMATE PARTNER BATTERING

Defendant contends The trial court erred in allowing expert testimony on domestic violence. We disagree.

A. *Procedural Background*

The People filed a motion in limine requesting the trial court to permit Detective Vaughn to testify as an expert on domestic violence. The People stated in their written

10

motion that they intended to use his testimony to educate the jury regarding the Power and Control Wheel, Cycle of Violence, and domestic violence victims' common behaviors, such as victims avoiding or delaying reporting abuse to law enforcement and victims recanting their initial statements in order to protect the abuser. It was undisputed Detective Vaughn qualified as a domestic violence expert.

The trial court stated that Detective Vaughn could educate the jury on domestic violence but could not provide any opinion testimony on whether defendant committed the charged crimes. The prosecutor agreed and noted Detective Vaughn had not been involved in the investigation of defendant's crimes and did not know the parties. The prosecutor stated that Detective Vaughn's testimony would assist the jury in determining M.M.'s credibility and why she delayed reporting most of the incidents right after they occurred. Defense counsel objected to Detective Vaughn testifying because domestic violence is not a recognized science and is "just science at best." Defense counsel asserted that Detective Vaughn's testimony would be of de minimis probative value and prejudicially impugn defendant's character. After reviewing case law on the subject, the trial court stated it would review Detective Vaughn's CV, and assuming it showed he qualified as an expert, the court would allow his testimony under Evidence Code section 1107, subdivision (a).

At trial, Detective Vaughn testified regarding intimate partner battering, including discussing common misconceptions and myths about batterers and victims. He stated that, based on his experience, it is common for domestic violence victims to remain in

11

situations they know are bad and it is also common for victims not to report abuse to the police. Detective Vaughn further discussed the power and control wheel, the cycle of violence in abusive relationships, and dynamics of power and control. Detective Vaughn stated typical behaviors used by abusers, including threatening and isolating victims from their friends and family. Detective Vaughn explained that victims typically attempt to "keep the peace" to avoid upsetting the abuser. Victims often stay with an abuser out of love or hope the abuser will change, or because the victim does not want to be responsible for breaking up their family. Detective Vaughn stated that he did not investigate or have anything to do with defendant's case.

B. *Law on Admissibility of Domestic Violence Expert Testimony*

Evidence Code section 801, subdivision (a), allows expert testimony on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Expert witness testimony on domestic abuse "cannot be admitted to prove the occurrence of the charged crimes." (*People v. Brown* (2004) 33 Cal.4th 892, 908.) It may be admitted, however, to explain the behavior of the victims of such abuse. (*Ibid.*)

Evidence Code section 1107, subdivision (a) provides: "In a criminal action, *expert testimony is admissible* by either the prosecution or the defense regarding *intimate partner battering and its effects*, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Italics added.)

12

Subdivision (b) of Evidence Code section 1107 further provides: "The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on *intimate partner battering and its effects* shall not be considered a new scientific technique whose reliability is unproven." (Italics added.)

The Legislative Counsel's Digest for Senate Bill No. 1385, which amended Evidence Code section 1107, effective January 1, 2005, explains that "[e]xisting law permits the admission in criminal actions of expert testimony regarding battered women's syndrome, including testimony on the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, as specified. Existing law defines terms for purposes of this law and provides that these provisions shall be known and may be cited as the Expert Witness Testimony on *Battered Women's Experiences* Section of the Evidence Code. [¶] This bill would instead make these provisions known and citable as the *Expert Witness Testimony on Intimate Partner Battering and Its Effects* Section of the Evidence Code, and would change all references to '*Battered Women's Syndrome*' in that section to read '*intimate partner battering and its effects*.' It would also clarify the definition of 'domestic violence' as used in this provision. This bill would also indicate that its amendments of these provisions are not intended to impact existing decisional law, as specified." (Stats.2004, c. 609 (S.B.1385), § 1, italics added.)

Before Evidence Code section 1107 was amended to encompass "intimate partner battering and its effects," the defendant in *Brown* argued that, because there was no evidence he abused the victim more than once, the victim was not a battered woman. Defendant asserted that, therefore, expert testimony on domestic violence was inadmissible under Evidence Code section 1107. (*People v. Brown*, *supra*, 33 Cal.4th at p. 895.) The California Supreme Court in *People v. Brown*, *supra*, 33 Cal.4th 892, held that, because the evidence was admissible under Evidence Code section 801, there was no need to reach the question of whether the expert testimony was also admissible under Evidence Code section 1107. (*People v. Brown*, *supra*, at p. 896.)

In *Brown*, the defendant was convicted of making a criminal threat, false imprisonment by violence, and misdemeanor battery on his cohabitant girlfriend, whose trial testimony differed from her statement to police immediately after the incident. (*People v. Brown*, *supra*, 33Cal.App. at pp. 896-898.) At trial, the prosecution presented expert testimony describing "the tendency of domestic violence victims to recant previous allegations of abuse as part of the particular behavior patterns commonly observed in abusive relationships." (*Id*. at p. 907.) The expert testified regarding the "cycle of violence" and the struggle for power and control between the abuser and the victim that later escalates to physical abuse. (*Ibid.*)

The court in *Brown* explained that such testimony was admissible under Evidence Code section 801: "When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume

14

that the victim is an untruthful or unreliable witness.  [Citations.]  And when the victim's

trial testimony supports the defendant or minimizes the violence of his actions, the jurors

may assume that if there really had been abusive behavior, the victim would not be

testifying in the defendant's favor.  [Citations.]  These are common notions about

domestic violence victims." (*People v. Brown*, *supra*, 33 Cal.4th at pp. 906-907.)

The *Brown* court concluded that, because there was an adequate foundation for the

expert testimony and the testimony assisted the jury in evaluating the evidence, the trial

court properly admitted the expert testimony concerning common behavior of domestic

violence victims.  (*People v. Brown*, *supra*, 33 Cal.4th at pp. 907-908.)  The *Brown* court

noted that in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087, the court concluded that

expert testimony was relevant to whether an abused victim acted reasonably and to the

victim's credibility, "because it would assist the jury 'by dispelling many of the

commonly held misconceptions about battered women.'"

After Evidence Code section 1107 was amended, the court in *People v.

Kovacich* (2011) 201 Cal.App.4th 863 (*Kovacich*), held that under Evidence Code

sections 801 and 1107, the trial court did not abuse its discretion in allowing expert

testimony on "intimate partner abuse." (*Kovacich*, *supra*, at p. 903.)  In *Kovacich*, *supra*,

201 Cal.App.4th 863, the defendant was convicted of the first degree murder of his wife,

committed after the defendant verbally and physically abused his wife over a period of

years.  (*Id.* at pp. 869-871.)  A domestic violence expert testified about the cycle of

violence in domestic abuse cases and the coping strategies or mechanisms that victims

15

develop to stay in their relationships, including denying, minimizing, or rationalizing the abuse. (*Id.* at pp. 900-901.)

The court in *Kovacich* concluded the trial court did not abuse its discretion in allowing the expert's testimony under Evidence Code sections 801 and 1107, because the victim's credibility and veracity of her statements of fear and abuse were at issue. The defendant had claimed that the victim's conduct, of staying in the relationship and returning to him on two prior occasions, was inconsistent with her statements of fear and that the defendant had physically abused her. The *Kovacich* court concluded the expert's testimony "was necessary to disabuse jurors of commonly held misconceptions about victims of domestic violence, and to explain the psychological reasons for such a victim's seemingly self-impeaching behavior." (*Kovacich*, *supra*, 201 Cal.App.4th at p. 902.) The *Kovacich* court noted that "expert testimony on domestic violence may include general descriptions of abuser behavior in order to 'explain the victim's actions in light of the abusive conduct.'" (*Id.* at p. 903.)

We review the admission of expert witness testimony under Evidence Code section 1107 for an abuse of discretion. (*Kovacich*, *supra*, 201 Cal.App.4th at p. 902.)

C. *Analysis*

Defendant contends the trial court abused its discretion by admitting intimate partner battering evidence as propensity evidence and exceeded the permissible bounds of admissible intimate partner battering evidence under Evidence Code section 1107. Defendant argues the People's reliance on *People v. Humphrey*, *supra*, 13 Cal.4th at page

16

1087, for the proposition Detective Vaughn's expert testimony was admissible is misplaced. While *People v. Humphrey*, *supra*, 13 Cal.4th 1073, is factually distinguishable, it supports the proposition that Detective Vaughn's expert testimony was relevant to the issues of whether M.M. acted reasonably. As the court in *Humphrey* concluded, such evidence was relevant and thus admissible because it would assist the jury "'by dispelling many of the commonly held misconceptions about battered women.'" (*Id*. at p. 1087.)

Defendant cites *People v. Julian* (2019) 34 Cal.App.5th 878, for the proposition that Detective Vaughn's expert testimony was improper because it was propensity evidence. Defendant's reliance on *Julian* is misplaced. In *People v. Julian*, *supra*, 34 Cal.App.5th 878, the defendant was convicted of child sexual abuse. During the trial, expert testimony was provided by a clinical psychologist, who testified to the statistical probability of sexually abused children providing false allegations of sexual abuse. The court in *Julian* held that such statistical testimony was improper because it went beyond the scope of permissible evidence of the child sexual abuse accommodation syndrome. (*Id*. at pp. 886-887.)

The *Julian* court explained such statistical probability evidence invited jurors to presume the defendant was guilty based on statistical probabilities, and not based on evidence properly introduced in the case. (*People v. Julian*, *supra*, 34 Cal.App.5th at p. 886.) The court stated that the effect of the opinion testimony was to improperly suggest the victim was telling the truth and, consequently, the defendant was guilty. (*Id*. at p.

17

887.)  The *Julian* court concluded that statistical evidence improperly supplanted the jury in its decision on whether the child victim's testimony was credible.  (*Ibid*.)

In the instant case, unlike in *Julian*, Detective Vaughn did not provide any statistical evidence.  His testimony was limited to a general, informative discussion of intimate partner battering and its effects on abused victims.  Detective Vaughn's testimony did not address the facts in defendant's case.  Detective Vaughn acknowledged that he could not comment on the dynamics of the case.  He noted he could only provide generic or general testimony regarding domestic violence.  Detective Vaughn further testified that he did not investigate or have anything to do with defendant's case.  At no point during Detective Vaughn's testimony did he discuss the facts of defendant's charged crimes or provide testimony that could be construed as propensity evidence exceeding the bounds of intimate partner battering evidence permissible under Evidence Code section 1107.

The jury was not invited, as defendant argues, to find that, based on Detective Vaughn's testimony on intimate partner battering and its effects, defendant committed the charged domestic violence crimes.  As permitted under Evidence Code section 1107, Detective Vaughn merely explained for the jury in general terms intimate partner battering and its effects.  In addition, the trial court instructed the jury that Detective Vaughn's expert testimony regarding the effect of intimate partner battering was not evidence that defendant committed the charged crimes.  The court also instructed that the jury could consider Detective Vaughn's testimony only in deciding whether M.M.'s

18

conduct was consistent with the conduct of someone who had been abused and in evaluating the credibility of her testimony. (CALCRIM No. 850.)

We also reject defendant's contention that the trial court's statement during sentencing, noting that defendant fit the criteria of a wife-beater demonstrates Detective Vaughn's testimony improperly created a profile of a domestic violence abuser. Defendant argues that trial court's comment defendant fit the profile shows that the jury likely impermissibly made the same assumption based on Detective Vaughn's profile testimony. We disagree. The court's comment was not made until after the jury entered its verdict and the record shows that Detective Vaughn's testimony was proper under Evidence Code section 1107. Furthermore, the jury was properly instructed that the testimony should not be considered as evidence defendant committed any of the charged crimes. This court must presume the jury followed the instruction (*People v. Avila* (2006) 38 Cal.4th 491, 574) and that, as instructed, the jury only considered Detective Vaughn's domestic violence testimony in evaluating M.M.'s conduct and credibility.

We thus conclude the trial court did not abuse its discretion in admitting Detective Vaughn's expert testimony. Detective Vaughn's testimony was relevant to M.M.'s credibility and to understanding her seemingly self-impeaching behavior of resuming her relationship with defendant after he had physically and verbally abused her, a matter generally not within common experience. (*Kovacich*, *supra*, 201 Cal.App.4th at p. 902; Evid. Code, §§ 801, subd. (a), 1107, subd. (a).) Detective Vaughn's testimony also did not exceed the limits of domestic violence evidence permissible under Evidence Code

19

section 1107. Even if it exceeded such limits, defendant did not object in the trial court and therefore the objection was forfeited. (*People v. Partida* 2005) 37 Cal.4th 428, 434-435; Evid. Code, § 353.)

## IV.

## ADMISSIBILITY OF TEXT MESSAGE EVIDENCE

Defendant contends the trial court abused its discretion by excluding two text messages between M.M. and defendant. We disagree.

A. *Procedural Background*

Mid-trial, the prosecutor explained to the court that defense counsel had recently informed the prosecutor that he intended to introduce various evidence, including text messages, which the prosecutor had not seen before. The prosecutor objected to the text messages based on lack of foundation. The court noted that it was looking at numerous exhibits for the first time, including the two text messages (exh. A & B). The court asked defendant for an offer of proof as to exhibits A and B. Defense counsel stated the texts were from M.M. to defendant and would be used to show M.M.'s bias against defendant. Defense counsel said defendant would provide the foundation for the evidence by testifying he received the texts from M.M. Counsel further asserted the foundation would be established by the unique information stated in the texts. Also, defendant was a percipient witness because he received and responded to the texts. Defense counsel explained that defendant used a phone app to download the messages from his cell phone.

20

The court noted the exhibit A text message began on September 9, 2016, after the charged offenses were reported to the police in August 2016. After looking at the text messages, the court asked defense counsel to elaborate on how he was going to lay a foundation for the exhibits. Defense counsel again stated defendant was a percipient witness because he replied to the text messages. The court asked how defendant would establish to whom the text messages were sent. Defense counsel stated that the text messages were not being offered for the truth. Defense counsel said the texts stated, "'Hey, you faggot,'" "'She's mine, only mine, and, yes, [f***] you, and [f***] off [as*h*le].'" Defense counsel said he was offering these statements to show M.M.'s bias and her attitude. Defendant claimed he was able to tell the texts were from M.M. based on her language and use of "Spanglish."

The prosecutor objected to the format of the texts, which were not screen shots and were not obtained in response to a search warrant. The prosecutor asserted that it could not be determined who "produced this typed up table document." The prosecutor therefore questioned the authenticity of the text messages, particularly since M.M. denied having sent them. The trial court agreed, stating "I'm holding up [e]xhibit A. This doesn't look like a screen shot or photograph from someone's cell phone like we had in the People's case. I don't know who – who did this, who authored this. It looks like it's typed up in columns. I have no idea." Quoting Evidence Code section 1401, the court stated that "'A writing must be authenticated before the writing or secondary evidence of

21

its content is admitted.'" The court added, "[t]his does not look like a screen shot from someone's cell phone at all."

Defense counsel offered to show the court defendant's cell phone. The court rejected the offer, stating that exhibit A, not defendant's phone, was before the court as an exhibit and the court could only rule on evidence properly presented to the court. Defense counsel suggested the prosecution's detectives could meet with the defense and look at defendant's phone, his phone app, and the app's printed-out text messages. The court stated defendant's suggestion was, in effect, a request for a continuance in the middle of the trial, which was unwarranted because defendant had the information before the trial. The court concluded the matter could not be handled efficiently within the next 15 minutes. Therefore, the court told defendant to proceed with calling his next witness.

Later, after defendant's first witness was done testifying and defendant was about to testify, the court and counsel met outside the presence of the jury. The court stated it had had ample time to review defendant's exhibits, and ruled that the text messages, exhibits A and B, would not be permitted. The court explained that they were writings under Evidence Code section 250, they were not probative evidence because they had been significantly altered, they were not relevant, and they were therefore inadmissible under Evidence Code sections 1400 and 1401.

B. *Analysis*

The People assert that, because defendant has not provided this court with exhibits A and B, defendant has failed to meet his burden of demonstrating error. The People

argue that, therefore, this court should reject defendant's objection to the evidence. We agree defendant has not provided this court with an adequate record of the text message at issue here. "'Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct . . . .' '"We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate error it will not be presumed. [Citation.]" [Citations.]'. . . [T]he defendant further bears the burden to provide a record on appeal which affirmatively shows that there was error below, and any uncertainty in the record must be resolved against the defendant." (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549; *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 1117.) "Where an appellant fails to supply a record adequate for review, his claim must fail." (*People v. Chubbuck*, *supra*, at p. 1117.)

Defendant's text message evidence was pre-marked as exhibits A and B, but the exhibits were not transmitted to this court for review. Therefore defendant has not provided an adequate record establishing error. We thus deem this issue forfeited for failure to provide an adequate record. (*People v. Chubbuck*, *supra*, 43 Cal.App.5th at p. 1117.) Regardless of this deficiency, we will address the issue on the merits to the extent we are able.

Defendant argues that the trial court erred in excluding his text message evidence on the basis of inadequate foundation. We disagree. It is undisputed that under Evidence Code section 250, exhibits A and B, which are text messages, are writings as defined by the Evidence Code. (Evid. Code, § 250.) "To be admissible in evidence, a writing must

be relevant and authenticated.  ([Evid. Code,] §§ 350, 1401.)  The proffered evidence must be an original writing or otherwise admissible secondary evidence of the writing's content.  ([Evid. Code,] §§ 1520, 1521.)"  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

"Authentication is to be determined by the trial court as a preliminary fact (Evid. Code, § 403, subd. (a)(3)) and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' ([Evid. Code,] § 1400).  The statutory definition ties authentication to relevance.  As explained by the California Law Revision Commission's comment to Evidence Code section 1400, '[b]efore any tangible object may be admitted into evidence, the party seeking to introduce the object must make a preliminary showing that the object is in some way relevant to the issues to be decided in the action.  When the object sought to be introduced is a writing, this preliminary showing of relevancy usually entails some proof that the writing is authentic—*i.e.,* that the writing was made or signed by its purported maker.  Hence, this showing is normally referred to as "authentication" of the writing.' [Citation.]  Authentication is essentially a subset of relevance.  [Citations.]"  (*People v. Goldsmith*, *supra*, 59 Cal.4th at pp. 266-267.)

The proof that is necessary to authenticate a writing varies with the nature of the evidence that the writing is being offered to prove and with the degree of possibility of error.  (*People v. Goldsmith*, *supra*, 59 Cal.4th at p. 267.)  The first step in determining

24

authentication of a writing is "to determine the purpose for which the evidence is being offered. The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. [Citation.] The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*Id*. at p. 267.)

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citations.]" (*People v. Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

Applying this standard, we conclude that the trial court did not err in excluding evidence of text messages contained in exhibits A and B. According to defense counsel, exhibits A and B were offered to show M.M.'s bias and her attitude. As the trial court mentioned, the evidence was offered to show M.M.'s motive and intent to falsely implicate defendant. Text message evidence is typically authenticated by secondary evidence consisting of a screen shot of the actual text message from a cell phone. This was not done in the instant case. Instead, defendant counsel produced a "typed up table

25

document," which defense counsel stated defendant would testify showed the text messages copied by a telephone app that produced the content of the texts in a different format than the actual text.

Although this court is unable to view exhibits A and B because they were not provided to this court, we conclude the trial court reasonably found that defendant had not established that the secondary evidence of the text messages provided the actual content of the original text messages or the origin of the text messages. Defendant did not demonstrate he could provide sufficient evidence for a trier of fact to find that exhibits A and B were what they purported to be, i.e., that the documents were genuine for the purpose offered and the language in the documents did not alter or fabricate the language in the actual text messages. Without making such a preliminary showing, exhibits A and B were not relevant and therefore properly excluded.

V.

EXCLUSION OF DEFENDANT'S SURREBUTTAL EVIDENCE

Defendant argues the trial court abused its discretion by denying his request to provide surrebuttal evidence in violation of his Fifth and Sixth amendment rights to testify in his own defense. We disagree.

A. *Procedural Background*

During defendant's defense, he denied ever texting Nora. Defendant testified that after he was in Mexico for three weeks, he checked his email and saw an email from M.M. sent in April 2016, while he was in Mexico, stating she had gotten a restraining

26

order based on Nora reporting that defendant had "friended" her. Defendant denied texting or calling Nora during that time because he was in Mexico. Defendant also denied having access to M.M.'s e-mail accounts, denied sharing an iCloud account with M.M., and denied knowing M.M.'s password to her account. He testified that M.M. threatened not to let him see their child after she was born, and M.M. told him she was going to lie that defendant hit her and threatened to kill her and their baby.

During the prosecution's rebuttal of the defense case, Deputy Cunanan testified that defendant initially said he did not know if he sent M.M.'s sister, Nora, text messages and said he might have done so. Deputy Cunanan testified defendant did not explicitly deny sending the text messages to Nora. Also during rebuttal MGF testified he had seen defendant at a liquor store in May 2016, and defendant was not using a cane. The prosecutor showed a video of defendant and MGF's encounter at the liquor store. The prosecution also presented evidence that defendant purchased iPhones for himself and M.M. Each phone had an attached iCloud account and associated email, with defendant having access to M.M.'s account but M.M. not having access to his account.

At the end of the prosecution rebuttal, defendant requested to testify as a surrebuttal witness. Defendant wanted to refute impeachment evidence and allegations he violated the restraining order. Specifically, defense counsel wanted to rebut Deputy Cunanan's statement that defendant admitted texting Nora, and establish he was in Mexico when he allegedly went to see Nora. He also wanted to address the video evidence of defendant walking without a cane. The prosecution used the evidence to

27

collaterally impeach defendant. Defendant wanted to explain that he was using a wheelchair and cane in court because he was injured in a serious traffic collision after the charged offenses were filed. Defense counsel further wanted to address M.M.'s testimony that defendant had access to her iCloud email, thus suggesting defendant fabricated derogatory e-mails defendant claimed M.M. had sent him. Defendant wanted to present evidence that he did not have access to M.M.'s iCloud account and email.

The trial court denied defendant's request for surrebuttal on the ground the topics defendant wanted to address had already been raised and addressed during defendant's previous testimony. The court concluded there was no new information raised during rebuttal that entitled defendant to surrebuttal. Defendant renewed his surrebuttal request before closing argument. The prosecutor objected, arguing all of the proposed surrebuttal topics had already been addressed during defendant's direct testimony and cross-examination. The trial agreed and denied defendant's renewed surrebuttal request.

B. *Applicable Law*

"A trial judge may limit the scope of surrebuttal evidence to prevent repetition of matter that should have been covered in the original case or to prevent unfairness to the other party." (*People v. Lamb*, *supra*, 136 Cal.App.4th at p. 582.) Trial courts are vested with broad discretion in deciding the admissibility of evidence in general (*People v. Williams* (1997) 16 Cal.4th 153, 197), and in determining the propriety of admitting surrebuttal evidence in particular. (*People v. Lamb*, *supra*, at p. 582.) A trial court's decision to admit or exclude evidence is reviewed on appeal for abuse of discretion.

28

(*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446.) Likewise the court's admission or exclusion of surrebuttal evidence is reviewed for abuse of discretion. (*People v. Lamb*, *supra*, at p. 582.) It is the unusual case in which an evidentiary ruling claimed to be erroneous will rise to the level of federal constitutional error. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232.) We conclude that this case is not such an unusual case.

After the parties present their respective cases in chief, they may present rebuttal evidence unless the court, for good cause, permits the parties to offer additional evidence on their original respective cases. (Code Civ. Proc., § 607, subd. (6); see Pen. Code, § 1093, subd. (d).) In criminal cases, rebuttal evidence presented by the prosecution is appropriate if it "tend[s] to disprove a fact of consequence on which the defendant has introduced evidence. [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1088.) "'[T]he scope of rebuttal must be specific.'" (*People v. Loker* (2008) 44 Cal.4th 691, 715.) Surrebuttal evidence may be presented by the defendant in response to rebuttal evidence presented by the prosecution. (See *People v. Avila* (2014) 59 Cal.4th 496, 504.) But surrebuttal by a defendant is proper "to rebut *only new* matter educed by the People." (*People v. Remington* (1925) 74 Cal.App. 371, 376.) And the scope of surrebuttal evidence may be restricted by the trial court to prevent introduction of repetitive matter that should have been presented by the defendant in his or her case-in-chief. (*Lamb*, *supra*, 136 Cal.App.4th at p. 582.)

C. *Analysis*

Here, defendant presented his defense case, which included lengthy testimony by defendant on direct, cross-examination, re-direct, and recross-examination. The trial court reasonably concluded that the prosecution did not present any new information during rebuttal that entitled defendant to surrebuttal. Further, defendant has not demonstrated that any additional surrebuttal testimony or evidence would have established that his witnesses and theories were more credible than those of the prosecution. The trial court also reasonably concluded surrebuttal would have been repetitive, time consuming, and of minimal benefit to the defense. Defendant was given an opportunity to fully present his defense and received a fair trial. Under such circumstances, the trial court appropriately avoided unnecessarily prolonging the trial by denying defendant's request for surrebuttal.

VI.

FINES AND FEES

Defendant contends the trial court abused its discretion in imposing various fines, fees, and assessments. Defendant argues the court-ordered fines and fees were improper because there was no hearing on his ability to pay them and he is unable to pay the court-ordered fines and fees.

A. *Procedural Background*

During defendant's sentencing hearing on July 13, 2018, the court sentenced defendant to an aggregate term of 12 years in prison. The court followed the probation

officer's recommendations regarding imposing fines and fees, with the exception the court did not order a $10,000 restitution fine or pre-sentence probation report fee.[2]

The trial court ordered defendant to pay the following fines and fees: $1,000 restitution fine; stayed $1,000 parole revocation restitution fine; $390 criminal conviction assessment fee; $520 court operations assessment fee; $514.58 booking fee; and $1,500 pre-sentence incarceration fee for 41 days of incarceration. The court also ordered defendant to pay $4,600 in victim restitution and possible future victim restitution claims related to the case. Defendant did not object during the sentencing hearing to these fines and fees. There was also no discussion of defendant's ability to pay the fines and fees. At the end of the sentencing hearing, defendant's trial attorney informed the trial court that defendant's family would be retaining an attorney to file an appeal on defendant's behalf.

On January 8, 2019, *Dueñas*, *supra*, 30 Cal.App.5th 1157, was decided. Relying on *Dueñas*, on September 9, 2019, defendant filed in the trial court a letter brief requesting the trial court to vacate its July 13, 2018, fines and fees order under *Dueñas*. Defendant argued that the trial court did not consider his ability to pay the fines and fees.

---

[2] Although the minute order for the sentencing hearing states defendant was ordered to pay a pre-sentence probation report fee not to exceed $1,095, the reporter's transcript shows that the trial court did not order the fee. "Conflicts between the [court] reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.) Reconciling the conflict in favor of the reporter's transcript, we find that the trial court did not order defendant to pay a pre-sentence probation report fee.

On September 9, 2019, the trial court ruled that it could not take action on defendant's request to vacate the fines and fees order because the trial court had no jurisdiction to consider the order, because the case was on appeal.

C. *Applicable Law*

With regard to imposing a restitution fine, the court in *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157, held that, "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164; but see *People v. Hicks* (2019) 40 Cal.App.5th 320 [disagreeing with *Dueñas*], review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96, review granted Nov. 13, 2019, S257844 ["To the extent the *Dueñas* court implies that it is the prosecution's burden to prove that a defendant can pay an assessment (see *id.* at p. 1172), we disagree. It is the defendant who bears the burden of proving an inability to pay."].)

As to imposing court fees, the court in *Dueñas* concluded that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164; but see *People v. Hicks*, *supra*, 40 Cal.App.5th at p. 329

32

[disagreeing with *Dueñas*], review granted Nov. 26, 2019, S258946; *People v. Kopp*, *supra*, 38 Cal.App.5th at pp. 96-97, review granted Nov. 13, 2019, S257844 ["there is no due process requirement that the court hold an ability to pay hearing before imposing a punitive fine and only impose the fine if it determines the defendant can afford to pay it."].)

D. *Analysis*

The People argue defendant forfeited his objection to the fines and fees by failing to raise his objection in the trial court. As to the various court-ordered fees, under *Dueñas* the issue was not forfeited by defendant's failure to object. (See *People v. Johnson* (2019) 35 Cal.App.5th 134; but see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153.) This is because the decision in *Dueñas* broke with longstanding precedent in requiring the court to consider ability to pay before imposing statutory minimum restitution fines and fees, and permitting an appellate challenge absent an objection in the trial court.

The issue of forfeiture is not as clear cut as to defendant's $1,000 restitution fine, because the court-ordered restitution fine exceeded the statutory minimum of $300 for restitution and parole revocation restitution fines. (Pen. Code, §§ 1202.4, subd. (b), 1202.45.) Therefore, even before *Dueñas* was decided, there was reason for defendant to object in the trial court to the $1,000 fine based on inability to pay. Under Penal Code section 1202.4, subdivision (d), a defendant shall bear the burden of demonstrating his or her inability to pay a restitution fine exceeding the statutory minimum.

Unlike the defendant in *Dueñas*, defendant here had the statutory right to object to $700 of the $1,000 restitution fine imposed by the court, but did not do so. As such, he forfeited this claim of error on appeal. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*) [noting that "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd[s]. (c) [& (d) ] ) expressly permitted such a challenge"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 [noting before *Dueñas*, an objection to a fine above the statutory minimum would not have been futile]; *People v. Jenkins* (2019) 40 Cal.App.5th 30, 40.) Nevertheless, because the court in *Dueñas* indicates that this matter should be remanded to provide defendant with an opportunity to address whether he has the ability to pay the court-ordered fees, the trial court may also consider defendant's ability to pay the $1,000 restitution fines.

The People argue that any failure to address defendant's ability to pay the fines and fees is harmless error because the record demonstrates he has the ability to pay the fines and fees from his prison earnings and after he completes his 12 year sentence. We recognize that this court may consider defendant's prison earnings, in addition to his ability to work after his release from prison. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's ability to obtain prison wages]; Pen. Code, § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].) However, because

the issue of ability to pay was not addressed in the trial court, it is not clear from the record whether defendant will be able to pay the fines and fees from his prison earnings and post-release employment.

According to the sentencing report, defendant is 38 years old; has a high school diploma; was unemployed at the time of the charged offenses; previously worked in construction and as a caretaker for a relative; had a monthly income of $1,200; paid $500 in rent; had a leg injury; and has a four year old daughter. Defendant is required to pay the $4,600 victim restitution fine and any additional future victim restitution claims, regardless of his ability to pay, which must be paid before paying the additional court-ordered fines and fees totaling $3,924.58 ($514.58 + $1,500 + $1,000 + $390 + $520).

We conclude the record does not sufficiently demonstrate that defendant will be able to pay the court-ordered fines and fees from prison wages or after his release. Therefore, under *Dueñas*, defendant is entitled to an ability to pay hearing. Thus, remand is necessary.

## VII.

## DISPOSITION

We reverse the trial court order imposing the following fines and fees: $1,000 restitution fine; stayed $1,000 parole revocation restitution fine; $390 criminal conviction assessment fee; $520 court operations assessment fee; $514.58 booking fee; and $1,500 pre-sentence incarceration cost for 41 days of incarceration. We remand the case to the trial court with directions to conduct a hearing to determine whether defendant is able to

35

pay the court-ordered fines and fees, and also stay execution of the restitution fine unless and until the People prove that defendant has the present ability to pay it.  (*Duenas*, *supra*, 30 Cal.App.5th at pp. 1172-1173.)  The judgment is affirmed in all other respects.

In the event the trial court reinstates the same previously ordered fines and fees, the trial court is directed to amend the July 13, 2018, sentencing minute order and abstract of judgment to reflect that, according to the reporter's transcript, the trial court did not order defendant to pay a pre-sentence probation report fee, not to exceed $1,095.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.